# PENNSYLVANIA RAILROAD COMPANY.

## vs.

## S. M. HAMILTON COAL COMPANY.

*Implied Contract—Course of Dealing—Carrier—Refunding of Freight.*

In an action by a coal company against a railroad company for damages on account of the latter's failure to collect for plaintiff from other members of an exchange, in connection with an arrangement for the pooling of coal shipments, freight which had been prepaid by plaintiff on coal shipped, *held* that the evidence failed to show an implied contract by defendant to collect such freight, based on the course of dealing between the parties, though there had been a temporary practice of making such collections.                   pp. 567-569

A contract by a carrier to refund to a shipper freight paid to it by the latter, without any legally enforceable right in such carrier to recover the amount of such freight from another, involves in effect a contract to haul shipments free, which is invalid under the Interstate Commerce Act.              p. 569

A carrier of freight can contract for no services not provided for in its tariff, and a contract by which it undertakes to do so is unenforceable.                      p. 569

*Decided November 16th, 1923.*

Appeal from the Superior Court of Baltimore City (DUFFY, J.).

Action by the S. M. Hamilton Coal Company against the Pennsylvania Railroad Company. From a judgment for plaintiff, defendant appeals. Reversed.

The cause was argued before Boyd, C. J., Thomas, Patti-son, Urner, Stockbridge, Adkins, and Offutt, JJ.

*Ralph Robinson,* for the appellant.

*Thomas F. Cadwalader,* with whom was *Horace S. Whitman* on the brief, for the appellee.

Adkins, J., delivered the opinion of the Court.

This appeal is from a judgment in favor of the appellee for failure of appellant to collect for appellee from certain other members of the Tidewater Coal Exchange, Inc., freight which had been prepaid by appellee on coal, shipped by it to Canton Piers over a subsidiary line of the Pennsylvania Railroad system, consigned to the exchange for account of appellee and, in accordance with the rules and regulations of the exchange, loaded on a ship for account of such other members.

This exchange was incorporated or began operations on the first day of May, 1920. It was the successor of an unincorporated concern known as "Tidewater Coal Exchange" which was organized and operated by an agency of the United States Government during the world war to facilitate the shipment of coal.

Canton Piers belonged to the Pennsylvania Railroad Company and, prior to the taking over by the Government of the railroads of the country, freight to those piers was carried only on the Pennsylvania Railroad system. But during Government administration coal was delivered there indiscriminately by the Pennsylvania, Baltimore & Ohio and Western Maryland Railroads, the Railroad Administration, however, continuing the regulations which as to payment of freight had previously existed on the respective roads, under which regulations freight was prepaid at the point of shipment on the Pennsylvania system, while on the other roads it was collected on delivery. To prevent confusion, arrangement was made by the Railroad Administration with shippers

over the Pennsylvania system, where coal was not loaded on a vessel at the piers for the account of the original shipper, to collect for him from those for whose account the coal was re-shipped the freight which had been prepaid by the original shipper.

All shippers to these piers were members of the exchange, and all coal shipped there was pooled. There were a number of pools corresponding to the number of grades of coal. All coal was consigned to the exchange for account of the member whose coal it was, the exchange, on the arrival of the coal, notifying the member and giving him credit for the tonnage. The coal remained in the cars until transferred to vessels, but frequently was not re-shipped for account of the original shipper. Any member of the exchange could give an order to the exchange for such number of tons as he desired to have loaded on a vessel, designating the number of the pool from which it was to be taken; whereupon the exchange ordered the carrier to dump the coal from any available cars containing coal of that character, the carrier reporting to the exchange the numbers and initials of the cars dumped in compliance with the order, thus enabling the exchange to adjust its accounts with the members. On giving such an order the exchange charged the account of the member with the number of tons designated in the order. If this overdrew the account of the member, he was obliged to ship in to the piers enough coal to make his account good. If he shipped this coal over the Pennsylvania system, he paid the freight in advance; and if it was loaded on a vessel for account of some other member, the freight was collected by the Railroad Administration from the member for whom it was loaded and returned to the original shipper, who had made his account with the exchange good. When the railroads were turned back to the companies on March 1st, 1920, shipment of coal by the Baltimore & Ohio and Western Maryland Railroads to Canton Piers ceased, but for some time thereafter there remained coal in storage on the piers in cars of these

companies in which coal had been shipped, freight collect by members of the exchange, as well as coal in cars of the Pennsylvania system on which freight had been prepaid. All the coal thus remaining was taken over by The Tidewater Coal Exchange, Incorporated, organized by shippers of coal, which succeeded the old exchange, which had been organized and operated by the Railroad Administration. The railroad companies were not members of the new organization and had no vote therein. They were invited, however, by the members to appoint, and did appoint, representatives to act in an advisory capacity, the representative of the Pennsylvania Railroad Company, the appellant herein, appearing from the testimony to have been quite regular in attendance at the meetings and to have been familiar with the rules and regulations of the association. The railroad companies paid the expenses of the exchange and the tariff filed by appellant showed that it was paying its part of these expenses.

It further appears from the testimony that appellant, on resuming the operation of its railroad, continued for a time the practices inaugurated by the Government above set out, including the double freight collections. This seems to have continued until June 25th, 1920, by which time the cars of the Baltimore & Ohio and Western Maryland Railroads had all been dumped.

A week or two prior to this date all members of the exchange were notified of the proposed abandonment by appellant of the practice of collecting freight at Canton Piers. The following correspondence will show the notice received by appellee:

"Pennsylvania System,

Mr. H. P. Conner, Assistant Treasurer,

Philadelphia, Pa.

Dear Sir:

About a week ago I had a telephone conversation with you relative to handling freight on coal shipped into Canton Piers for export. My memory is that you told me at that time that as soon as the B. & O. and

Western Maryland coal that had been shipped into Canton Piers had been cleaned up that the collecting of freight at Canton would be discontinued, and that all shipments into the pier would be prepaid, and that would be the only freight collected by the Pennsylvania Road.

What I am now after is some advise from you as to when this new system of yours will go into effect; that is to say, when and where will we find the dividing line?

On May 27th we completed loading at Canton Piers the SS. 'Teespool.' Quite a number of the cars dumped into this boat were shipped into the piers by other shippers, and the agent at Canton sent us bills for the freight on coal shipped by other shippers, on a collect basis, which we have paid. We expect shortly to put another boat into these piers for loading, and I would like to have your advices as to how this freight will be handled.

Yours very truly,

S. M. HAMILTON COAL COMPANY,
Auditor."

"Philadelphia, June 18, 1920.

S. M. Hamilton Coal Co.,
Mr. R. T. Naylor, Auditor,
Marine Bank Building,
Baltimore, Md.

Dear Sir:

Replying to your letter of yesterday, you should have no further trouble at Canton Piers in the matter of paying freight charges on coal on the collect basis when the coal has reached Baltimore on a prepaid basis, whether the coal, which is dumped for your account, was shipped by you or by others.

Instructions are going forward today to our agent to discontinue collections on a collect basis on coal which has been shipped on a prepaid basis, the understanding being that members of the pool will adjust between

themselves any difference that may exist in the freight charges on coal consigned to the member shippers.

I trust I have made myself clear, and should you have any further trouble I will ask you to please notify me at once. Of course, the prepaid charges must be paid. If they are not paid, by reason of the refusal of our drafts, the above arrangement cannot be carried out.

Yours very truly,<br>
H. P. CONNER,<br>
Assistant Treasurer."

It will be seen from the above that appellee was notified, two weeks before it went into operation, of the proposed change, and that on June 18th, 1920, one week before the change went into effect, appellee was informed that instructions were that day going out to agents of appellant to discontinue collection of freight at the piers.

In loading the ship "Teespool" on May 27th, 1920, appellee overdrew its account with the exchange more than 2,000 tons of coal, and paid the "collect freight" on the borrowed coal. It was still to that extent on the debit side of the books of the exchange on June 26th, 1923, when the new arrangement went into effect, although it appears from the testimony that, prior to this date, coal had been shipped by appellee to meet this shortage, and was then on the way, freight prepaid, on the cars of one of the subsidiary companies of the Pennsylvania system; but it was not delivered within the time limit fixed by appellant, and the result was that appellee had paid double freight on the amount of the borrowed coal, while the creditor members of the exchange, to whom was delivered the coal shipped by appellee to pay the amount borrowed, had paid no freight at all.

It was just such a situation that the suggestion contained in appellant's letter of June 18th, 1920, was intended to meet, viz: "that members of the pool will adjust between themselves any difference that may exist in the freight charges on coal consigned to the member shippers."

Nothing appears to have been done by the members as a body to make the adjustment; or by appellee individually to collect the freight at the piers from the members who got the coal on which it had prepaid the freight.

There were several meetings of representatives of appellant and members of the exchange during the summer of 1920, at which the situation was discussed.

No claim was ever filed by appellee with appellant for the freight involved in this suit.

Later on appellant wrote appellee the following letters:

"Pennsylvania System,
Eastern Region,
Treasury Department, Philadelphia.
December 14, 1920, Desk A.
Subject: Tidewater Coal Exchange, Inc.
S. M. Hamilton Coal Co.,
Marine Bank Building,
Baltimore, Md.

Dear Sirs:

As you are aware, the tariffs of our company require the prepayments of freights on bituminous coal to our several piers for trans-shipment by water.

Owing to the fact that for some time prior to June, 1920, we were obliged to handle over our piers at Canton, Baltimore, coal originating on other lines whose tariffs did not contain a prepaid freight requirement, during such period, with respect to coal consigned to the Tidewater Coal Exchange, we had an arrangement in effect under which the freight charges, on such cars as were dumped for the account of trans-shippers other than the original consignees, were collected at Canton piers from such trans-shippers and the prepaid charges refunded to the shippers. On coal dumped for the account of the original consignees no freight charges were collected at the piers, the prepaid freights as collected by our scale agents being retained.

As soon as it could be arranged after our Canton piers had disposed of all cars originating on lines other than the Pennsylvania System the practice of collecting freight charges at the piers was discontinued, this being effective on June 26, 1920.

While it is a fact that our company had only collected the freight charges on each car shipped, the trans-shippers who had credits with the Exchange as of the close of business on June 25th were enabled to obtain coal on these credits without having paid any freight charges thereon, those having debits being in the position of having to ship cars to fill such debits on which they were required to prepay the freight, having previously paid the freight on the coal drawn from the pool, this resulting in their having paid the freight charges twice on this tonnage.

Although our company, as stated above, has only collected the freight charges once on each car shipped, we are willing to use our best endeavors to have these freights adjusted among the members of the Exchange.

As the result of several conferences at Baltimore, at which representatives of our company, the Exchange, and of a number of the trans-shippers were present, it is proposed that the members having net credits with the Tidewater Coal Exchange, Inc. (the New Exchange), as of close of business on June 25, 1920, deposit with the Exchange the freight charges on such credits, the aggregate of such deposits, when all of them have been received, to be distributed by the Exchange to the members having net debits according to their respective tonnages.

It will be obvious to you that to make such a plan effective all members with debits or credits as of June 25, 1920, must agree to the adjustment of freight charges on such basis, and, therefore, we shall appreciate it if you will advise us by return mail if agreeable to you.

Before we proceed with the calculation of the freight charges on the various debits and credits we are submitting a statement thereof prepared by the Tidewater Coal Exchange, Inc., and would ask that you carefully check the debits and credits to you appearing therein, and advise if they are correct, and if not, what changes are necessary to have them agree with your records.

Your prompt attention to this matter is earnestly requested.

Yours truly,

H. P. CONNER,

Assistant Treasurer."

"Pennsylvania System,

Eastern Region,

Treasury Department.

Philadelphia, December 14, 1921.

Desk A.

S. M. Hamilton Coal Co.,

Mr. R. T. Naylor, Auditor,

Marine Bank Building,

Baltimore, Md.

Dear Sir:

I duly received your favor of November 15th, in which you advised me that as soon as the shippers interested in the adjustment of freight charges among the members of the Tidewater Coal Exchange, Inc., had decided on what steps they were going to take you would notify me.

I have heard nothing further from you, but as I have now received from our auditor of local freight traffic the statement of freight charges on debits and credits involved, based on the average rate in each pool, I take pleasure in enclosing herewith a copy of the same, which you will note is set up as the original tonnage statement was by pools.

I have also worked up the same information to show the net amount due by or to each member, and I believe, in handling this adjustment, the latter basis is the one will have to be used, unless, of course, it is decided to settle by pools. I have not had any copies of the statement by members made up, and before doing so will await further advices from you as to what action the various members contemplate taking to adjust the matter.

Yours truly,
H. P. CONNER,
Assistant Treasurer."

On February 23rd, 1922, appellee brought suit in the Superior Court of Baltimore City on the common counts and a special count as follows:

"And for that heretofore, to wit, on or about the 15th day of June, A. D. 1920, the defendant drew its sight drafts upon the plaintiff for the amount of the freight on 2,283 3-20 tons of bituminous coal shipped by the Chartiers Creek Coal Company from its Hazel Mines at or near Cannonsburg, Pennsylvania, consigned to the Tidewater Coal Exchange, Pool 30, for account of the S. M. Hamilton Coal Company, Canton Coal Piers, Baltimore, Maryland, and the said plaintiff duly accepted and paid the said drafts upon the understanding with the defendant that said coal was intended either to create a credit for the plaintiff or to cancel a debit of the plaintiff then existing in said Pool 30 of the Tidewater Coal Exchange, the named consignee, or in part to cancel a debit and create a credit for the balance in said pool, and upon the further understanding with the defendant that if said coal upon arrival should be delivered to or upon the order of any party or parties than the plaintiff whether such parties be members of said Exchange or not, the defendant should collect the freight thereon from such party or parties either by requiring such

party or parties to pay the same before delivery if deemed necessary in its discretion for the purpose of securing the same, or otherwise, and after collecting the same should refund the amount thereof to the plaintiff; and the said coal upon arrival at the Canton Coal Piers was delivered to or upon the order of a party or parties other than the plaintiff, and the defendant did not collect the freight thereon from said party or parties so receiving same, and did not refund said freight to the plaintiff, whereby the amount of said freight for which the defendant as heretofore stated had drawn upon the plaintiff and which the plaintiff had paid became and was wholly lost to the plaintiff, as the defendant well knew; and the defendant, contrary to its said understanding and agreement with the plaintiff, retained, and still retains, the money so paid by the plaintiff, to wit, the sum of $2.35 per ton, or a total of $5,363.05 as compensation to it, the said defendant, for transportation services rendered to and for a party or parties other than the plaintiff, and for which, as said defendant well knew, it was its duty and its agreement as understood by the said defendant and the said plaintiff in the premises to look to such other party or parties alone, and to indemnify the plaintiff for the prepayment thereof."

To this declaration the general issue pleas were filed; and on the trial of the case a verdict was rendered in favor of appellee for $6,113.90.

From the judgment entered on that verdict this appeal was taken.

There are thirty-one bills of exception, twenty-nine of which were taken to rulings of the trial court on evidence. The last two were to the rejection of defendant's first and second prayers, each of which asked for an instructed verdict.

The first prayer sought to have the case withdrawn from the jury on the ground that there was no evidence legally

sufficient to entitle the plaintiff to recover, and the rejection of this prayer constituted defendant's thirtieth exception.

In the view we take of this case it will be unnecessary to consider the other exceptions.

Plaintiff's theory of the case is that there was an implied contract growing out of the course of dealing between the parties, beginning during the period of Government operations of appellant's railroad and continuing after the resumption of operation by appellant on March 1st, 1920, down to the close of business on June 25th, 1920.

There is abundance of evidence in the record to show that the dealings were as hereinbefore outlined. So far as these dealings were between the appellee and the Federal Administration no contract could be inferred from them, binding on the appellant. *Atkinson* v. *Phila., B. & W. R. R. Co.,* 137 Md. 632.

This precise question was not decided in the above case, but the principle on which that decision was based is that one cannot be held responsible for the act of another over whom he has no control. These previous dealings are important only as they reflect upon the subsequent dealings between the parties to this suit. When appellant resumed control of its property it found the situation as above described, and so long as the causes existed which gave rise to that situation, it continued the practices which had been inaugurated by the Railroad Administration. The mere fact that it encouraged the formation of the new exchange did not necessarily indicate an intention to continue the practice that had prevailed in regard to the collection of freight. In fact there is nothing in the rules and regulations of the exchange which seemed to recognize the existence, or contemplate the continuance, of such practice. Rule 15 required members to sign an agreement that they would be responsible for, and pay to the carriers, all freight charges *when way-billed collect;* but there is no rule which required members to pay again to a carrier freight which had been prepaid.

Rule 16 does not necessarily deal with such a situation. It provides that "adjustments of freight charges must, if necessary, be made with the railroad companies by the member and not by the exchange." That provision would seem rather to apply to such a case as where freight had been paid in advance at the export rate and it subsequently developed that the coal was to be shipped to a point inside the Capes, the rates being different. In any event there is nothing in the rule to indicate that it contemplated a double collection of freight by the carrier.

Undoubtedly it was a convenience both to the carrier and to the shipper to continue the practice of collecting freight at the piers so long as other carriers were doing business there under that system, but the reason for it ceased when there were no longer any cars of the Baltimore & Ohio Railroad and the Western Maryland Railroad to be unloaded there.

We find nothing in the course of dealings between appellant and appellee from which a contract to collect and refund freight can be inferred. The practice was nothing more than a temporary regulation for the convenience of both parties which could be abandoned on reasonable notice. That this was the understanding of both appellant and appellee is indicated by the exchange of letters in regard to the proposed charge on June 17th and June 18th, 1920, which letters are hereinbefore set out. There is evidence in the case that members of the exchange were complaining of this double collection of freight, and the letter of June 18th tells the auditor of appellee, to whom it is addressed, that he "should have no further trouble at Canton Piers in the matter of paying freight charges on coal on the collect basis when the coal has reached Baltimore on a prepaid basis, whether the coal, which is dumped for your account, was shipped by you or by others."

As to the length of notice, appellee knew two weeks before the change went into effect that it was going to be made as

soon as the Baltimore & Ohio and Western Maryland Coal at Canton Piers had been cleaned up; and he had definite notice by the letter of June 18th that instructions were then being sent to the agent of appellant "to discontinue collections on a collect basis on coal which had been shipped on a prepaid basis, the understanding being that members of the pool will adjust between themselves any difference that may exist in the freight charges on coal consigned to the member shippers."

This gave appellee ample time to arrange for its own protection, as the coal, on which it had prepaid freight, had not been delivered and was not in fact delivered until after June 25th, 1920. It is unreasonable to suppose that the exchange would, under these changed conditions, have disregarded a request from appellee to give no order for the delivery of this coal until it should be satisfied in regard to the payment of freight by the trans-shipper; or appellee could have changed the consignee, substituting itself for the exchange, and thus been in a position to protect itself as to the refund of freight. *Ruhl* v. *Corner,* 63 Md. 179.

But aside from all this, an insuperable objection to the theory of an enforceable contract arising from dealings between the parties is that the tariff of appellant made no provision for the collection of freight on delivery. The freight having been prepaid as provided by the tariff, the carrier was bound to deliver the coal without further exaction, and the return of the freight to it by the trans-shipper was entirely voluntary and could not have been enforced. In this situation, if appellant undertook to bind itself to refund freight to appellee, it was virtually agreeing to haul the coal free in the event of the refusal of the trans-shipper to return the freight; which of course it could not do under the Interstate Commerce Act.

But even if this were not so, a carrier of freight can contract for no service not provided for in its tariff, and if it undertakes to do so, such a contract is unenforceable. *Keogh*

v. *Chicago & N. W. Ry.* 260 U. S. 156; *New York, N. H. & H. R. R. Co.* v. *Interstate Commerce Commission,* 200 U. S. 361; *Texas & Pac. Ry. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426.

All that *United States* v. *Erie R. R. Co.,* 209 Fed. 283, cited by appellee, decided, was that certain privileges and advantages extended to the consignee came within the jurisdiction of the Interstate Commerce Commission rather than that of a criminal court "the act being more regulative and administrative than criminal."

Our conclusion is that the first prayer of the defendant should have ben granted, and that the judgment must be reversed without a new trial.

*Judgment reversed without a new trial, with costs to appellant.*