**TEXAS CITY TERMINAL RAILWAY COMPANY, Plaintiff,**

v.

**AMERICAN EQUITABLE ASSURANCE COMPANY OF NEW YORK et al., Defendants.**

**Civ. A. No. 542.**

United States District Court
S. D. Texas, Galveston Division.

April 25, 1955.

---

12. 342 U.S. 25, 27, 72 S.Ct. 17, 19.

Wigley, McLeod, Mills & Shirley, Galveston, Tex., Preston Shirley, Galveston, Tex., for plaintiff Texas City Terminal Ry. Co.

Austin Y. Bryan, Jr., Houston, Tex., for defendants American Equitable Assurance Co. of New York and Colonial Assurance Co. of Philadelphia.

Thompson, Coe & Cousins, Dallas, Tex. (Will C. Thompson and R. B. Cousins, III), Dallas, Tex., for defendants Aetna Ins. Co., American Ins. Co., National Fire Ins. Co., Norwich Union Fire Ins. Society, Ltd., The Travelers Fire Ins. Co., and Yorkshire Ins. Co., Ltd.

Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., Newton Gresham, Houston, Tex., for defendants Pacific Fire Ins. Co. and United States Fire Ins. Co.

INGRAHAM, District Judge.

The facts and circumstances under which this litigation arose may be briefly stated as follows:

Prior to April 16, 1947, the United States instituted a program of furnishing fertilizer to certain foreign countries. The fertilizer was shipped by rail from points in Nebraska and Iowa to Texas City, Texas, under Government bills of lading and was described on the bills of lading variously as fertilizing compounds, fertilizer compound or similar description. Plaintiff, Texas City Terminal Railway Company, hereinafter referred to as Terminal, was the switching carrier involved in these shipments receiving the commodity from the line haul carriers and moving it to the Terminal's own waterfront warehouses at which place the Terminal employees would unload it into warehouses owned and operated by the Terminal. All of the fertilizer involved in the explosions which is the subject of this suit was thus unloaded into Warehouse O of the Terminal and there kept by the Terminal awaiting further directions from the owners of the fertilizer. All of the fertilizer was consigned to the French Supply Council care of J. D. Latta. Latta as agent for the French Supply Council made the necessary arrangements for cargo space aboard ocean-going vessels to transport the fertilizer to overseas destination. While in the Terminal warehouses the fertilizer was stacked in separate piles in carload lots which were identified by car numbers.

After the French Supply Council made the necessary arrangements for a ship to go to Texas City to take on the cargo, the French Supply Council through its agent Latta then would give an order to the steamship company to load a stated number of carloads of fertilizer and the exact car numbers would be listed on the statement. The ship which was to take the cargo would then berth at the docks of the Terminal at Texas City and the cargo was removed from the Terminal's warehouse by longshoremen employed by the ship's stevedore. These longshoremen trucked the fertilizer out of the Terminal's warehouse, placed it in either rope slings or wooden trays alongside ship and the slings or trays would be hoisted aboard ship and into the ship's hold and there unloaded by other longshoremen. The ship's gear was used to conduct this hoisting operation and was operated by the longshoremen. No Terminal employee handled the cargo after it was picked up on the warehouse floor by the longshoremen and the Terminal and its employees had nothing to do with the trucking of the commodity from inside the warehouse to shipside, the hoisting it aboard ship or unloading and stacking of the cargo in the hold of the ship. The Terminal had no right or power to control the longshoremen or the ship's stevedore and paid them nothing, their services being paid for by the steamship company. The longshoremen and stevedore were not employees of the Terminal but on the contrary were either employees of, or contractors for, the ship's agent. Likewise, the Terminal had no right or power to control the ship or its officers and crew. On April 10, 1947, the Steamship High Flyer, which was at all times owned, operated and controlled by Lykes Bros. Steamship Company, had berthed at Texas City adjacent to Pier O and using the manner above set forth approximately 961 tons of fertilizer had been loaded in Hold No. 3 aboard the High Flyer, this loading being completed on April 11, 1947. An on-board ocean bill of lading was issued by Lykes Bros. Steamship Company to

cover this cargo, the bill of lading being dated April 11, 1947. After the loading of the fertilizer was completed, the High Flyer was moved from its berth at Pier O in the North slip to a berth adjacent to Pier A in the main slip. Warehouses O and A separated and were between the North and Main slips. After the High Flyer had been moved from Pier O and on April 11, 1947, the Steamship Grandcamp which was owned, operated and controlled by the French Government docked adjacent to Pier O. Fertilizer had been loaded in the same manner in Holds Numbers 2 and 4 of the Grandcamp on April 11, 12, 13, 14 and 15. Hold No. 4 of the Grandcamp was not worked the night of April 15th and the hatch covers on Hold No. 4 had been securely fastened at the time the longshoremen quit work on the afternoon of the 15th. Ocean bills of lading had been issued covering all of the fertilizer aboard the Grandcamp. On the morning of April 16, 1947, the longshoremen reported for work at 8:00 A.M. at Hold No. 4. They took off the hatch covers and went into Hold No. 4. After being in the hold some 10 minutes or more and prior to any fertilizer being loaded into No. 4, the longshoremen noticed a small wisp of smoke coming up from out of the fertilizer in the hold. The longshoremen and ship's crew used a jug or two of water and then under the direction of the ship's officers, fire extinguishers were used in an effort to put out the fire in No. 4 hold. These were unsuccessful and the captain of the ship then ordered the hatch covers placed back on Hold No. 4 and the injection of steam into that hold for the purpose of smothering the fire. This was also unsuccessful. In the meantime a fire alarm had been given. The City of Texas City had a volunteer fire department and within a short time after the giving of the fire alarm, the volunteer fire department of Texas City had its equipment and men present and commenced fighting the fire aboard the ship. The fire department's efforts to put out the fire in No. 4 were unsuccessful and at 9:12

A.M. on April 16, 1947, the fertilizer in Hold No. 4 of the Grandcamp exploded, causing practically the simultaneous explosion of the fertilizer in Hold No. 2 with the combined effect being to obliterate the Grandcamp and to cause a large amount of damage to the Terminal's properties as well as to other properties in Texas City. As above stated the Grandcamp was owned, operated and controlled by the French Government and its Master had the control of fire fighting aboard that ship. Upon arrival of the volunteer fire department, that department continued the fighting of the fire aboard the ship. Prior to the explosion on the Grandcamp, the fire had not spread to any building or facility owned by the Terminal. The waters adjacent to Pier O were navigable waters with a depth of approximately 34 feet but the land under the waters in the slip over which the Grandcamp was berthed were owned by the Terminal.

At the time of the explosion on the Grandcamp, the High Flyer was berthed adjacent to Pier A in the main slip and as a result of the Grandcamp's explosion, was severely damaged with its hatch covers being blown off and with the exception one line was completely blown loose from its moorings. Shortly after the explosion of the Grandcamp, this remaining line was thrown off by the ship's crew. The High Flyer then drifted over across the main slip to a point alongside the steamship Wilson B. Keene which was berthed at Pier B. The Wilson B. Keene was between the High Flyer and Pier B dock. The High Flyer at all times material hereto was owned, operated and controlled by Lykes Bros. Steamship Company.

It is not entirely clear as to when fire was first observed aboard the High Flyer but some time during the late afternoon or early evening of April 16th smoke was observed coming from that ship. Late the night of the 16th an effort was made to remove the High Flyer by tugs employed by the ship's owner but was unsuccessful. Some 10 or 15 minutes before the explosion on the High Flyer,

large balls of fire described by witnesses as resembling Roman candles were observed shooting out of the ship and at 1:10 A.M., April 17, 1947, an explosion occurred aboard the Steamship High Flyer which obliterated that ship and caused further damage to Terminal's properties. In answer to a Special Interrogatory the jury found that the origin of the fire aboard the High Flyer was fire directly communicated from the explosion of the Grandcamp as opposed to sparks originating from fires of and on the Terminal's properties during the day of the 16th after the explosion on the Grandcamp.

On April 16, 1947, the Terminal had in full force and effect one blanket policy of insurance covering its properties against the risk of explosion, one fire insurance policy covering specifically certain of the Terminal's properties and eight other blanket fire insurance policies covering jointly the remaining properties of the Terminal.

The explosion policy No. R 35–7509 was for the face amount of $2,300,000 and was issued by the defendant, Colonial Assurance Company of Philadelphia. By endorsement the defendant, American Equitable Assurance Company of New York assumed the liability of Colonial Assurance Company of Philadelphia on this policy. The validity of the Colonial Assurance Company of Philadelphia's explosion policy and the assumption of liability by American Equitable Assurance Company of New York has been stipulated. For brevity, Colonial Assurance Company of Philadelphia and American Equitable Assurance Company of New York will be referred to as "American Equitable Group". The American Equitable Group explosion policy covers all property of the Terminal with certain named exceptions "against all direct loss or damages caused by any of the following: (1) riot; (2) riot attending a strike; (3) insurrection; (4) civil commotion; (5) explosion directly caused by any of the foregoing; (6) explosion occurring from causes other than above described (excluding fire resulting from such explosion) whether originating on the premises of the assured or elsewhere."

Said policy also provides "this Company shall not be liable for loss or damage covered under any fire or other kind of insurance contract."

The fire insurance policy No. 35–12345 covering specific property of the Terminal was issued by Colonial Assurance Company of Philadelphia, the liability under which was also assumed by American Equitable Assurance Company of New York. This policy was for the face amount of $857,500 and covered specified Terminal wharf aprons, bulkheads and other specific property of the Terminal.

The Terminal's eight separate blanket fire insurance policies were respectively issued by Aetna Insurance Company, American Insurance Company, National Fire Insurance Company, Norwich Union Fire Insurance Society, Ltd., Pacific Fire Insurance Company, The Travelers Fire Insurance Company, United States Fire Insurance Company and Yorkshire Insurance Company, Ltd. Each of these eight fire policies are identical in terms varying only as to the company issuing it and the face amount of the policy. Each of said policies is contributing each with the other and the total face value of these policies is $1,450,000. For brevity, this group of companies will be referred to as the Aetna Group. These fire policies cover generally all of the properties of the Terminal except "property more specifically insured".

On July 16, 1947, American Equitable Group denied liability upon its explosion policy. Shortly thereafter suit was brought by the Terminal against American Equitable Group for recovery under the explosion policy. By answer and an impleading petition, American Equitable Group impleaded the Aetna Group. The Aetna Group in turn impleaded a large number of parties who had goods on the premises of the Terminal. These parties owning goods on the premises have either defaulted in making any claim here or have affirmatively disclaimed any

interest. Subsequently Terminal sought recovery under all of the above policies.

The case was tried before a jury which found in answer to special interrogatories that explosions occurred aboard both ships and that the origin of the fire aboard the High Flyer was fire communicated directly from the explosion on the Grandcamp. In addition, the jury further found the actual cash value of the various facilities of the Terminal, the loss or damage to each facility, the cost of debris removal and the amount of loss or damage and cost of debris removal caused separately by the explosion on the Grandcamp, the explosion on the High Flyer and fires ensuing after either or both of the explosions. The number of special interrogatories submitted by the court and answered by the jury, including the dollar findings of cash value of the facilities, loss and damage, cost of debris removal, cost of repairs and allocations, was 431. For this reason I will refer generally to the verdicts of the jury and will not repeat them here in full.

Perhaps the biggest single controversy in the case is whether or not the damages caused to the Terminal by the explosions on the Steamships Grandcamp and High Flyer are within the coverage of American Equitable Group's explosion policy or whether such damages are within the coverage of American Equitable Group and the Aetna Group fire policies. Terminal primarily contends that the damage caused by these two explosions are under the coverage of American Equitable Group's explosion policy as does the Aetna Group. In the alternative, Terminal seeks recovery for the damages caused by the two explosions under its fire policies. American Equitable Group on the other hand contends that the damage caused by the explosions on the two ships is within the coverage of its and the Aetna Group's fire policies.

 The damage caused by both explosions is within the coverage of American Equitable Group's explosion policy. Long prior to the explosion, the Terminal had parted with any custody or control of the fertilizer that had exploded on the Grandcamp. The Grandcamp was owned, operated and controlled by the French Government and the Terminal had no possession, custody or control over the ship or the cargo aboard it. The cargo was in the exclusive possession and control of the French Government as the owners and operators of the Grandcamp. While it is true that there was a fire on board the Grandcamp prior to the explosion, this fire was not one covered by any fire policy taken out by the Terminal. Insofar as the Terminal was concerned, the fire was uninsured and in the same category as any other fire which might occur in Texas City on property owned, operated and controlled by other persons. The fire aboard the Grandcamp as it existed prior to the explosion thereon would not and did not give the Terminal any right or cause of action for any recovery under any fire policy carried by it. American Equitable Group does not contend that the fire aboard the Grandcamp was an insured fire or that the fire policies of the Terminal covered the fertilizer burning aboard the Grandcamp. Under such circumstances, insofar as any loss to the Terminal is concerned, the damage was caused by the explosion on board the Grandcamp. Considering the underlying principal established by the decisions on the subject, the correct rule is that if there is an insured fire, that is, a fire in an insured building, and fire coverage exists prior to the explosion, then the explosion may be considered as incidental to the fire and the entire damage recoverable under a fire policy. But if the fire which leads to an explosion is not an insured fire, that is, not a fire covered by any of the assured's fire policies, then the actual cause of loss determines the policy under which the recovery is had. Insofar as the Terminal is concerned, the fire aboard the Grandcamp was not a fire within the meaning of any fire insurance policies held by the Terminal and therefore, an explosion resulting from that fire could not in any sense be considered as inci-

dental to any fire coverage under Terminal's fire policies because the fire itself was not under the Terminal's policies nor covered by them. The Supreme Court of Texas has adopted this rule. In United States Insurance Company of Waco v. Boyer, 269 S.W.2d 340, 343, in a suit which did not involve the precise question of fire and explosion, the Supreme Court laid down the test to be applied in the following language which is quoted from an A.L.R. quotation:

"'The test applied under the rule of proximate cause seems to be that where, and only where, *an insured peril* sets other causes in motion which in unbroken sequence and connection produce the final result for which the insured seeks to recover under his policy, the peril insured against will be regarded as the direct and proximate cause of the entire loss, so as to render the insurer liable for the entire loss within the limits fixed by the policy. The rationale behind this rule is that the scope of insurance protection is defined by the application of the proximate cause standard, according to which a specified loss is compensable *if and only if caused by a peril covered by the policy*.'" (Italics mine.)

American Equitable Group's contention fails to meet the test announced in the above case in that the fire aboard the Grandcamp upon which American Equitable Group relies to make this a case of fire coverage was not "'an insured peril'" and was not "'a peril covered by the policy.'"

In Northwestern National Insurance Company v. Mims, Tex.Civ.App., 226 S.W. 738, 742, Mrs. Mims, the owner of the Mims Building, held a policy of fire insurance with an explosion exception. A terrific explosion occurred in the Westmoreland Building immediately adjacent to and adjoining the Mims Building, completely demolishing the Westmoreland Building and the Mims Building. Mrs. Mims brought suit upon the theory that a fire had preceded the explosion of the Westmoreland Building and that it was fire that set in motion the chain of events resulting in an explosion in the Westmoreland Building which demolished the Mims Building, the building involved in the suit. The Court held that no coverage existed under the fire policy but on the contrary the loss was caused by explosion and in so holding said:

"*Explosions not infrequently occur, caused by antecedent fires, which damage buildings for miles around. In such a case, could the holder of a fire insurance policy with an explosion clause therein, as here presented, covering a building situate several miles distant from the explosion, recover for the damage to his building caused by the concussion of the distant explosion? We think not. Such a loss falls within the scope of explosion insurance rather than fire insurance. And if the insurer against fire is not liable for the damage wrought by a far distant explosion caused by an antecedent fire, neither would he be liable where the explosion occurs in an adjoining building, for the degree of proximity of the explosion is immaterial in construing the terms of the contract and measuring the liability assumed by the insurer.* Construing the Mims policy as a whole, and giving to the explosion clause a fair and reasonable interpretation, we think such clause excepted from the risk assumed any liability for damage wrought by an explosion in the Westmoreland Building caused by antecedent fire in such building." (Italics mine.)

Again in Liverpool & London & Globe Insurance Co. v. Currie, Tex.Civ.App., 234 S.W. 232, error refused, another case involving the same explosion, the Court in substance again held that if the fire causing the explosion was not an insured fire, then there would be no coverage under the fire policy and in so holding said:

"But after diligent search we have been unable to find any case holding that damage from an explosion was

within the risk assumed under a fire policy containing an explosion clause as an excepted risk where the explosion occurs in, and is caused by, an antecedent fire *in a building other than the insured premises. The authorities all say there is no liability, and this court has so held in the companion case of [Northwestern National] Insurance Company v. Mims, 226 S.W. 738."* (Italics mine.)

And in an annotation at 38 L.R.A., N.S., Page 476, the rule is stated as follows:

"Under a policy insuring against the direct loss or damage by fire, which provides that the insurer shall not be liable for loss caused directly or indirectly by an explosion of any kind, there can be no recovery for loss from the *concussion of an explosion occurring in another building,* although such explosion would not have happened but for the existence of fire in such other property." (Italics mine.)

And at 13 A.L.R., Page 891, the rule is stated in the following language:

"It is generally held, where a policy insures against loss by fire, and provides against liability for loss caused directly or indirectly by an explosion of any kind, that the insurer is not liable for losses occasioned merely by *the concussion of an explosion which occurs in another building,* although the explosion was caused by the existence of a fire." (Italics mine.)

Under all of the above authorities and many more which could be cited if the fire in an adjoining building, or as here, a ship, is not an insured fire then the loss caused by an explosion resulting from the fire cannot be recovered under a fire policy and must therefore be recovered under the terms of American Equitable Group's explosion policy. Since the fire aboard the Grandcamp was not covered under the Terminal's fire policies, the result of the explosion aboard the Grand-

camp could not change the preceding fire aboard that vessel into an insured fire and in that manner make the explosion which was incidental to that fire come within the terms of the Terminal's fire policies.

In Exchange Bank of Novinger v. Iowa State Insurance Company, 218 Mo. App. 587, 265 S.W. 855, 856, the Court held and said:

"It is insisted that the court erred in giving its declaration of law, to the effect that plaintiff was not entitled to recover for the damage caused by the concussion from the explosion. The authorities in this state and in some other states hold that where fire *occurs in the property insured, and an explosion takes place therein during the progress of the fire, the effects of which are covered by the policy,* and such explosion is a mere incident of the preceding fire, the fire is treated as the efficient cause and the whole loss is within the risk of the insurer, although the policy in terms excludes liability for loss by explosion. La Force v. [Williams City Fire] Insurance Co., 43 Mo.App. 518; Cohn & Greenman v. [National] Ins. Co., 96 Mo.App. 315, 70 S.W. 259; Hallander v. [Jefferson Mut. Fire] Insurance Co. (Mo.App.) 218 S.W. 418; Wheeler v. [Phenix] Insurance Co., 203 N.Y. 283, 96 N.E. 452, 38 L.R.A. (N.S.) 474, Ann.Cas.1913A, 1297. *However, so far as we have been able to discover, it has been universally held that such a policy does not make the insurer liable for losses occasioned merely by concussion from an explosion which occurs in another building, although the explosion was caused by an antecedent fire."* (Italics mine.)

Again in Hall & Hawkins v. National Fire Insurance Company, 115 Tenn. 513, 92 S.W. 402, a policy had been issued upon plaintiff's property covering fire but with an explosion exception. A fire broke out in a building south of plaintiff's storehouse and about 30 feet distant from it.

While the fire was in progress, a terrific explosion occurred which destroyed plaintiff's property. Under such circumstances, plaintiff sought to recover under his fire policy, but the Court held that no liability or coverage existed and said:

"The weight of the authority is to the effect that *where the fire occurs in the property insured, and an explosion takes place therein during the progress of the fire, the effects of which are covered by the policy,* and such explosion is a mere incident of the preceding fire, the latter is treated as the efficient cause, and the whole loss is within the risk insured, although the policy in terms excludes liability for loss by explosion. * * *

" 'If a fire occurs by a cause within the policy, and an explosion takes place as an incident to the fire, so as to increase the loss, the whole damage is within the policy, although it contains an exemption from liability for the explosion' ". (Italics mine.)

The Court then proceeded to hold that since the preceding fire was not an insured fire the explosion could not be considered as within the coverage of the plaintiff's fire policy.

Under all of the decisions and many more which could be cited, since the fire aboard the Steamship Grandcamp was not an insured fire, even assuming that the fire aboard the Grandcamp caused the explosion on that ship, it was the explosion which caused the damage to Terminal's property. Coverage exists under American Equitable Group's explosion policy. The fire aboard the Grandcamp was not a fire covered by any of Terminal's fire policies. The exception referred to in the explosion policy that there should be no liability for "loss or damage covered by any fire or other kind of insurance contract" necessarily refers to the fire insurance policies held by the Terminal and since the fire aboard the Grandcamp was not within the coverage of Terminal's fire policies, the exception in American Equitable Group's policy is unavailing to it.

Therefore, the damage caused by the explosion on the Steamship Grandcamp is within the coverage of American Equitable Group's explosion policy. Since the jury has found that the origin of the fire aboard the High Flyer came directly from the explosion on the Grandcamp as distinguished from the sparks from the Terminal's property, the damage caused by the explosion on the Steamship High Flyer also is within the coverage of the explosion policy to the same extent as the damage caused by the explosion on the Grandcamp.

American Equitable Group now contends that its explosion policy covers all goods of others on Terminal premises and in the alternative while it is not clear as to American Equitable Group's exact contention, it may be that American Equitable Group now contends that the Terminal was actually liable for goods of others and that the loss or damage to these goods should be added to the coverage of the explosion policy. It has been stipulated that there were $19,632,143 of goods of others on the premises, of which $921,354 consisted of goods of the Ludlow Manufacturing Company. The parties are in disagreement as to whether the contract with the Terminal under which Ludlow Manufacturing Company was on the Terminal premises constituted a lease or bailment, but in view of the conclusions here reached, it is not necessary to further consider this question.

American Equitable Group's explosion policy covers the following property of Terminal:

"*$2,300,000.00* On all property of the assured consisting of buildings, sheds, trestles, tanks, conveyors, platforms, aprons, bulkheads, steel sheet piling, scales and other structures, their additions, extensions, attachments and appurtenances, including all fixtures, fire fighting apparatus, plumbing, piling, electric light wiring and equipment within and outside of buildings and structures; and on machinery, rolling stock, equipment and appurtenances of the

plant of all kinds and nature, including spare parts; and on contents of buildings consisting of stores, machinery, office furniture, fixtures and supplies and other similar property of the Assured while contained in or on the above described buildings, platforms and structures, and in yards and premises adjacent thereto, and in or on tracts and railroad tracks as defined below, all situate at or near Texas City, Galveston County, Texas."

Immediately after the above quoted coverage provision, the policy then sets forth the railroad tracks which are insured; then makes specific provision with respect to certain conditions not prejudicing the Terminal's rights; then refers specially to the coverage with respect to wood and steel piling; then provides the American Equitable Group is not relieved from payment because of certain conditions; then contains a clause as to "Pillage and Looting"; and then excludes loss or damage caused by explosion originating within any automobile or aircraft.

The explosion policy next contains a co-insurance clause reading as follows:

"Coinsurance, Reduced rate contribution or average clause—In consideration of the reduced rates and/or form under which this policy is written, it is expressly stipulated and made a condition of this contract that in the event of loss this Company shall be liable for no greater proportion thereof than the amount hereby assured bears to Ninety Per Cent of the actual cash value of the property described herein at the time when such loss shall happen, nor for more than the proportion which this policy bears to the total insurance thereon."

After the co-insurance clause, there are four other paragraphs not material here and then the policy has the following provision:

"It is understood and agreed that this insurance also covers the interest of the assured in and/or liability for *similar property* belonging in whole or in part to others, and held by the assured either sold but not removed on storage or for repairs, or otherwise held." (Italics mine.)

It is under this last clause hereinafter called the "liability clause" that American Equitable Group now contends first, that its explosion policy covers all of the goods of others on the Terminal premises and second, in the alternative American Equitable Group's position while not clear may be that American Equitable Group now contends that the Terminal was actually liable for the goods of others on the premises and that the loss or damage to the goods of others for which American Equitable Group says the Terminal is actually liable should be added to the coverage of American Equitable Group's explosion policy. American Equitable Group next contends that after adding the total value of the goods of others or in the alternative the total loss or damage to the goods of others for which American Equitable Group says Terminal is actually liable, the 90% co-insurance clause should be applied, thus reducing very substantially Terminal's recovery. The rights of the other persons with goods on the premises are not involved here. All such persons were impleaded and have either defaulted in making any claim or now have affirmatively disclaimed any interest in the proceeds of the policies involved here. Applying American Equitable Group's first position to the facts of the case, the jury's findings and stipulated facts establish that the property owned by the Terminal and covered by American Equitable Group's explosion policy on April 16, 1947, had an actual cash value of $4,437,-864; including at this time the property of Ludlow Manufacturing Company the actual cash value of the goods of others on the premises was $19,632,143. If American Equitable Group's first contention be correct then the total actual cash value of the property of Terminal and the goods of others on April 16, 1947, would be $24,070,007. Then further following American Equitable Group's contention

and applying the 90% co-insurance clause contained in the explosion policy, insurance in the amount of $21,663,006 was required in order to avoid the penalty of the co-insurance clause upon and as applied to Terminal's own property. Having $2,300,000 in explosion insurance the ratio of insurance carried to 90% of the actual cash value under American Equitable Group's contention would be 10.617% and Terminal would recover only 10.617% of its loss and damage.

Applying American Equitable Group's possible alternative theory, and assuming for the time being that American Equitable Group makes such contention and that the Terminal was actually liable for the damage to goods of others, caused by the explosions on the Grandcamp and High Flyer, this would also operate to materially reduce Terminal's recovery when taken in connection with American Equitable Group's further possible contention that the 90% co-insurance clause should be applied to this loss or damage.

These contentions and positions of American Equitable Group cannot be sustained. American Equitable Group's explosion policy does not cover the goods of others nor does it cover any actual liability for the loss or damage to goods of others, stored on the premises here.

■ As to American Equitable Group's first contention that its explosion policy covers the goods of others, the rule appears to be well established that if the primary intent of the policy provision is to cover *property*, then the property of others will ordinarily be included within the coverage of the policy, but if the primary intent is not to cover property then equally so, property is not included.

In United States v. Globe & Rutgers Fire Insurance Co., U.S.D.C.N.D.Tex., 104 F.Supp. 632, 633, the coverage provision of the policy provided:

" 'On cotton, ginned and unginned, baled and unbaled, seed cotton, cotton seed, supplies of sacks and other packaging material containing or to contain cotton seed, and bagging and

ties, their own, and provided the insured is legally liable therefor, this policy shall also cover such *property* sold but not delivered, held in trust or on consignment or for storage.' " (Italics mine.)

Judge Dooley held that under the above provision *property* as distinguished from liability was covered, but clearly recognized that in situations similar to our present case the policy would not cover the property of others. Judge Dooley clearly recognized that under a policy similar to the one involved here *property* was not covered. Judge Dooley said:

"In contrast are those cases where the policy clearly insured the *property, and those cases where with equal clarity the policy insured only the liability of the insured with respect to the property.*" (Italics mine.)

and further said:

"If the policy provision in fact read 'on the liability' of the insured then to be sure it only could mean liability for fire loss of the property, and the plaintiff would fail in the suit. This is true for the simple reason that a fire insurance policy, like many forms of insurance, is a contract of pecuniary indemnity. Its subject matter must have a money measure. Such insurance on *liability* cannot become payable apart from an incurred liability of the insured for money damages or at least a pecuniary obligation."

In the same case on appeal Globe & Rutgers Fire Insurance Company v. United States, 5 Cir., 202 F.2d 696, this same distinction between property and liability is made. In affirming the judgment below Judge Russell speaking for the Court said:

"The determination of the trial Court that the policies furnished insurance protection against the loss of the cottonseed by fire, and the consequent judgment awarding the plaintiff recovery, was supported by a well considered memorandum opin-

ion(1). We find the reasoning of the trial Court sound and its judgment correct."

In Note (1) referred to in the quotation from the Court's opinion the Court states:

"In it the Court reviewed the authorities in the general field and found them diverse, depending largely upon the multiform policy provisions differing from case to case. Decisions in cases where the policy insured the property. California Ins. Co. v. Union Compress Co., 133 U.S. 387, 10 S.Ct. 365, 33 L.Ed. 730; Hartford Fire Ins. Co. v. Evans, Tex.Civ.App., 255 S.W. 487; Southern Cold Storage & Produce Co. v. A. F. Dechman & Co., Tex.Civ.App., 73 S.W. 545; Home Ins. Co. v. Favorite, 46 Ill. 263; Lucas v. Liverpool & London & Globe Ins. Co., 23 W.Va. 258; Johnston v. Charles Abresch Co., 123 Wis. 130, 101 N.W. 395, 68 L.R.A. 934, *and others where the policy insured only the liability of the insured with respect to property,* Allen v. Royal Ins. Co., Tex.Civ. App., 49 S.W. 931; Millers' Mutual Fire Ins. Ass'n v. Warroad Potato Growers Ass'n, 8 Cir., 94 F.2d 741; In re Podolsky, 3 Cir., 115 F.2d 965; McCoy v. Home Ins. Co., 170 Pa. Super 38, 84 A.2d 249; Michigan Fire & Marine Ins. Co. v. National Surety Corp., 8 Cir., 156 F.2d 329, were cited." (Italics mine.)

Both opinions refer to and approve certain cases in which the policy provisions were held to cover liability only. Judge Dooley's opinion refers to them as "those cases where with equal clarity the policy insured only the liability of the insured with respect to the property", and Judge Russell's opinion refers to them as "others where the policy insured only the liability of the insured with respect to property".

An analysis of the opinions cited with approval in the above case clearly shows that American Equitable Group's explosion policy does not cover the property of others.

In Allen v. Royal Insurance Company, Tex.Civ.App., 49 S.W. 931, the policy coverage provided " 'on their liability on cotton in bales * * *.' " The court held that the policy did not cover property. In re Podolsky, 3 Cir., 115 F.2d 965, 966, the coverage was on a retail stock of merchandise and additionally provided " 'also on his interest in and on his legal liability for similar property * * *.' " The Court held that this did not cover the property of others, saying:

"But the words in the policy taken out by the bankrupt in this case were 'on his interest in and on his legal liability for' property of others which he held in his possession. So far as it appears the legal interest of the bankrupt in this property was nothing, and if he had any interest the insurance money which he collected would to that extent undoubtedly go to his trustee and not to these claimants. Did he have any 'legal liability for' such property? A bailee, in the absence of express contract, is not liable for the loss of bailed goods if the loss is not caused by his negligence. 6 Am.Jur. § 242. The appellees claim in their brief that 'the bankrupt was legally liable to return the merchandise unused or to pay for the same'. But there is no basis for this statement in the stipulation, and the stipulation is our sole source of facts in this case. The language of the insurance policy is definite in limiting the liability of the insurance company to the interest or the legal liability of the assured for the bailed property. The insurer's obligation 'cannot be enlarged or varied by judicial construction'. Millers' Mut. Fire Ins. Ass'n v. Warroad Potato Growers Ass'n, 8 Cir.,1938, 94 F.2d 741, 742. It seems clear, therefore, that neither the assured nor these claimants would have had any right against the insurance companies to recover for the loss of the bailed property under the terms of the policies."

In McCoy v. Home Insurance Company, 170 Pa.Super. 38, 84 A.2d 249, 251, the policy contained the following additional coverage clause:

"(1) 'Property sold but not removed, *also the insured's interest in and legal liability for property* held by the insured as follows: *in trust* or on commission, on joint account with others, on storage, for repairs, *or otherwise* held; * * *.'

"(2) 'Subject in all other respects to the terms and conditions of this policy, this insurance is hereby extended to cover *the insured's interest in and liability for property herein described purchased on any credit or installment plan* * * *.' (Emphasis added.)"

The Court held that this clause did not cover the property of others, saying:

"The policy and clauses (1) and (2) insure the *interest of plaintiff in the property,* not *the property itself.* The terms of this policy clearly distinguish the instant case from Home Ins. Co. v. Baltimore Warehouse Co., 93 U.S. 527, 23 L.Ed. 868, and other cases, upon which plaintiff relied. In that line of cases, the policies insured the *property,* that is, the merchandise which was held in trust. Here only the *interest* of plaintiff in his property, and in property held by him 'in trust * * * or otherwise held' was insured. The actual cash value of his interest in the equipment was not greater than the installments he had paid upon the bailment leases, and that amount was paid to him. Plaintiff's further claim, if any, rests upon clauses (1) and (2). These clauses protected more than plaintiff's *interest* in the equipment; they insured his legal liability in respect to it. The question then is: What legal liability rested upon plaintiff by virtue of the bailment leases?" (Italics mine.)

■ Under the above decisions, American Equitable Group's explosion policy did not cover the property of others on the premises. The decisions cited by American Equitable Group do not support its position. In Home Insurance Co. v. Baltimore Warehouse Company, 93 U.S. 527, 23 L.Ed. 868, the policy covered "merchandise"; California Insurance Co. v. Union Compress Co., 133 U.S. 387, 10 S.Ct. 365, 33 L.Ed. 730, covered "property"; and American Eagle Fire Insurance Co. v. Gayle, 6 Cir., 108 F.2d 116, covered "such merchandise".

American Equitable Group's contention that its explosion policy covers all the goods of others on the premises is erroneous on still another ground.

It is undisputed that Texas Lines Tariff 21-R, approved by the Interstate Commerce Commission, provides as follows by Item 6580:

"Insurance

"The charges provided for herein do not include any expense for fire or storm insurance covering owner's interest in the property, nor will insurance be effected by this Company under its policies."

Texas City Terminal Railway Local Freight Tariff Nos. 8–Q, approved by the Interstate Commerce Commission promulgated by the Railroad Commission of Texas in Item 1B provides:

"No insurance of any kind is effected by Texas City Terminal Railway Company on any commodities stored or detained in warehouses under this tariff or otherwise, but will be arranged for on shipper's request and at shipper's expense."

These tariffs were in effect prior to and on April 16, 1947, and were applicable to all of the goods of others on the Terminal premises. In addition, the warehouse receipts when issued by the Terminal provided:

"Goods are not insured nor do storage rates include insurance unless so specified in writing."

These warehouse receipts covered a substantial part of the goods on the premises. It is undisputed that the Terminal did not receive any requests to insure owners goods, did not make any charge for in-

surance, and did not insure any goods of others under its policies, unless as a matter of law the property is covered under the policies involved in this suit.

Terminal contends that the provisions in the above tariffs are controlling, and that the American Equitable Group's explosion policy must be considered in connection with the tariffs. This is correct. The Terminal operated as a Terminal Railway; the published tariffs are binding upon it and all persons with which it deals—Southern Railway Co. v. Prescott, 240 U.S. 632, 36 S.Ct. 469, 60 L.Ed. 836. Tariff rules and provisions enter into and form a part of all contracts made with other persons— Hartness v. Iberia & V. R. Co., D.C.E.D. La., 297 F. 622, and tariff rules and regulations have the effect of statutes— Atchison, Topeka & Santa Fe Ry. Co. v. White, D.C.S.D.Cal., 49 F.Supp. 797— affirmed White v. Atchison, Topeka & Santa Fe Railway Co., 9 Cir., 149 F.2d 919.

In Sanford Mfg. Co. v. Western Mutual Fire Insurance Co., 229 Iowa 283, 294 N.W. 406, 407, a Terminal warehouse operator for Motor Truck Lines took out a policy of insurance which in the absence of other showing would clearly cover the goods of others on the premises and was so stated by the Court to cover the goods of others in the absence of any railroad commission regulation. However, the Railroad Commission in that case prior to the issuance of the policy had promulgated Rule 58 which provided in substance that Terminal operators should at all times keep in effect an insurance policy " 'covering the legal liability of the terminal operator for loss or damage to property in the possession or custody of the terminal operator * * *.' " However, the insurance policy actually issued was " 'On merchandise of all kinds, property of assured and for which assured may be legally liable' ". A fire occurred and one of the owners with goods on store sought to recover under the terms of the policy. The defendant insurance company contended that the policy must be construed in accordance with the Railroad Commission's rule. This contention was sustained by the Court which held that in view of the Railroad Commission's rule the policy would be construed not to cover the property of others. In so holding the Court said:

"We are satisfied that the insured, the insurer and the commission intended the bond to comply with Rule 58 and that it was filed and accepted as a compliance therewith to enable Hermann to continue to carry on his business of terminal operator and it must be construed in the light of the rule."

In the cited case the Railroad Commission's rule was held to be controlling over the provisions of the policy. Similarly, in our present case, the tariff provisions above quoted must be held to be controlling.

In Baltimore & Carolina S.S. Co. v. United States Merchants & Shippers Insurance Co., 159 Md. 641, 152 A. 491, 492, plaintiff carrier secured the issuance to it of an insurance policy on such goods for which it may be liable as owner, freighter, forwarder, bailee and/or common carrier or upon which the steamship company had agreed to effect insurance with the coverage to continue until delivery of the goods. A loss occurred as to certain goods held by the carrier and the carrier brought suit upon the insurance policy on behalf of the owners of the goods. The carrier in behalf of the owners of the goods contended that the insurance policy covered the loss. However, the carrier had published tariffs in effect which had been filed with and approved by the Interstate Commerce Commission which tariffs set a time limit of 48 hours for insurance on the goods of others. The Court held that the provisions of the tariff must be read into the contract the carrier had with the owners of the goods and further held that if the terms of the insurance policy conflicted with the terms of the tariff, the tariff would be controlling.

The Court said:

"The contracts between the carrier and the shippers are to be found in the tariff and bills of lading. It will be readily seen that in order to determine what the shippers' rights were, their contracts with the carrier must be read into the insurance policy * * *. The present case is one where the tariff entered into, and became a part of, the contract of insurance, and it becomes necessary to determine what the provision therein in regard to insurance means."

The Court then proceeded to hold that under the provisions of the tariff the goods of the owners were not covered and further held that if there was any contractual attempt to enlarge the tariffs such attempt would be void and on this particular point the Court said:

"But if it were possible to find contracts between the shippers and the carrier without reference to the carrier's tariff, and that under these contracts it was clearly the purpose of the carrier to give, and the expectation of the shippers to receive protection under the carriers insurance policy until delivery of the goods, even if such delivery should be delayed beyond the time limited in the tariff, the contracts would be unenforceable, because violative of the Interstate Commerce Act, in that such contracts would give shippers a service, advantage, or privilege not provided by the tariff. On this point we think our decisions in Pennsylvania R. Co. v. S. M. Hamilton Coal Co., 144 Md. 556, 125 A. 405, 35 A.L.R. 478, and Monongahela Ry. Co. v. Read, 147 Md. 144, 127 A. 739, are controlling. See also, Keogh v. Chicago & N. W. R. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183; Southern Railway Co. v. Prescott, 240 U.S. 632, 36 S.Ct. 469, 60 L.Ed. 836; Chicago, St. Paul, M. & O. R. Co. v. U. S., 8 Cir., 162 F. 835; Pennsylvania Co. v. U. S., 7 Cir., 257 F. 261."

■ Because of the provisions of the tariffs involved, the American Equitable Group's explosion policy does not cover the goods of others on the premises stored under the terms of said tariffs.

In addition and assuming that American Equitable Group's explosion policy did by its terms cover the property of others, and independent of the controlling effect of the tariffs, the policy was a contract between the Terminal and American Equitable Group as contracting parties for the benefit of the Third-Parties, i. e., those with goods on the premises. See Automobile Insurance Co. of Hartford, Conn. v. Barnes-Manley Wet Wash Laundry Co., 10 Cir., 168 F.2d 381. Being a third-party beneficiary contract, it was entirely proper for the owners of the goods on the premises to reject said contract or agree not to take the benefits thereof. The tariffs above referred to constitute a part of the contract between the Terminal and the owners of the goods on store and amounts to an affirmative rejection by the owners of the goods on store of the benefits of the Terminal's policies. The warehouse receipts also definitely amount to a rejection by the owners of the goods of any third-party beneficiary contract made and contained in the Terminal's policies. The disclaimers also constitute a rejection. Perhaps the leading case on this whole subject is Stillwell v. Staples, 19 N.Y. 401. In that case the plaintiff brought suit on an account for manufacturing cloth into garments. The defendant asserted a counter-claim and showed that the plaintiff was a manufacturer and as such carried five insurance policies containing a trust or commission clause, and that a fire occurred and at the time of the fire the defendant's property came within the meaning of the trust and commission clause. The defendant further showed that after the fire the plaintiff filed a claim for loss for its own property and did not include any claim for the loss of defendant's property which was held by plaintiff at the time of the fire. The plaintiff collected only for its loss and the defendant in the counter-claim asserted

that it was entitled to share in the proceeds recovered by the plaintiff from the insurance company. The Court in substance held that the contract was one made by the manufacturer for the benefit of other owners and that as such it could be cancelled, altered or modified by the manufacturer prior to its adoption by the third-party beneficiary. This holding is well illustrated by the following quotation from the opinion:

"The right of the owner of the goods to ratify or adopt such a policy, whether before or after a loss, must, from the nature of the case, be subject to certain limitations; that is, must be subordinate to the right of the party who obtained the policy, to deal with it as he pleases, up to the time of its actual adoption. Until then it is plain that no interest is vested in the principal, or obligation imposed upon the agent. I speak now, of course, of a case where the act of the agent in procuring the policy was, as in the present instance, purely voluntary and not pursuant to any direction of the principal or obligation growing out of the nature of the business. Suppose in such a case the agent should surrender the policy to the insurer, receiving back the premium, or even gratuitously cancel it, what right of the principal or duty of his own would he thereby violate? Clearly none. So long as the option of the owner of the goods to adopt or reject the policy continues, so long must the absolute control of the agent over the policy remain."

By analogy it would be equally competent for the person taking out the insurance that is, the Terminal, to agree with the owners of the goods that the insurance did not cover their property. The tariffs and warehouse receipts amount to such an agreement and remove the property of others from the coverage of the Terminal's policies.

■ And in Pittman v. Harris, 24 Tex.Civ.App. 503, 59 S.W. 1121, 1122, the defendant bailee had secured a policy broad enough to cover the property of the plaintiff. However, the evidence showed that the defendant had not intended to insure any property other than that belonging to himself and had collected from the insurance company only his own loss. Plaintiff brought suit to recover a portion of the money secured from the insurance company. The Court held that plaintiff was not entitled to recover and that before the plaintiff bailor's goods could be considered as covered by the policy, the plaintiff bailor must show that he had ratified the acts of the bailee in procuring insurance on his own property before the policy had been impaired. In so holding, the Court said:

"Before the plaintiff could claim any benefit under the policy executed under such circumstances, he must show that he elected to adopt the acts of defendants in procuring insurance on his property, of which defendants had notice before its force as a policy on his property had been impaired. Stillwell v. Staples, 19 N.Y. [401], 407; * * *."

Here the terms of the tariff and the warehouse receipts amount to an election by the owners of the goods on store that their property would not be covered by any policies secured by the Terminal. Under the circumstances of this case the American Equitable Group's explosion policy does not cover the property of others on the premises.

■ For still another reason, the tariffs and warehouse receipts are admissible and controlling.

Assuming that American Equitable Group's explosion policy in general terms is broad enough to cover the property of others, which it actually is not, a reading of the explosion policy does not disclose on its face the particular goods which are or might be insured and those which are not or might not be insured and of necessity extrinsic evidence must be introduced to show what goods are insured and what are not insured. Extrinsic evidence is necessary to prove up and identify the goods which are claimed to be covered by the policy.

Equally so, extrinsic evidence may be introduced to show what goods were not insured. See Parks v. General Interest Assurance Co., 22 Mass. 34, 5 Pick. 34. Also applying the doctrine of Stillwell v. Staples, above cited, the tariffs warehouse receipts and disclaimers are admissible to show that the owners of goods on store had elected and agreed not to be covered by the policy.

For the reasons given above American Equitable Group's explosion policy does not cover the property of others. Also, on the grounds hereinafter stated American Equitable Group's explosion policy not only does not cover the goods of others but also does not cover any actual liability (under American Equitable Group's possible alternate position) of the Terminal for the loss or damage to goods of others.

█ The American Equitable Group's explosion policy includes only "the interest of the assured in and/or liability for *similar property* belonging in whole or in part to others, and held by the assured either sold but not removed, on storage or for repairs, or otherwise held." The property of others on the Terminal premises was not "similar property" within the terms of the above provision. The word "similar" has been variously defined as exactly alike, Krakowski v. United States, 2 Cir., 161 F. 88, or as a synonym for the word "like", Castell v. United States, D.C., 20 F.Supp. 175, or being like in quality, nature, degree, purpose, or other characteristics. The Terminal's business was the operation of a terminal railroad, and as an incident thereto the furnishing of other services to aid in the transportation of goods and the storage of various commodities in the course of commerce for others. The property of the Terminal insured under the explosion coverage clause was all property of the Terminal consisting of buildings, sheds, trestles, tanks, conveyors, platforms, aprons, bulkheads, steel sheet piling, scales and other structures, their additions, extensions, their attachments and appurtenances, including all fixtures, fire fighting apparatus, plumbing, piling, electric light wiring and equipment, within and outside of buildings and structures; and on machinery, rolling stock, equipment and appurtenances, of the plant of all kinds and nature, including spare parts; and on contents of buildings consisting of stores, machinery, office furniture, fixtures and supplies and other similar property of the assured and certain railroad tracks. In other words, the property insured consisted of the Terminal's operating facilities, equipment and supplies used or to be used in the maintenance and operation of the facilities and business of the Terminal. "Similar property" within the meaning of American Equitable Group's "liability" clause would necessarily mean and be limited to property in the nature of operating facilities, equipment and supplies for use in connection therewith. The goods of others which American Equitable Group contends are similar property consist of cargo in course of commerce such as bagged flour, tin bullion, tin ore, bullion racks, knocked down French box car parts, bagged rice, bagged fertilizer, bagged sulphur, wool, mohair, wheat, carbon black and jute bagging. These goods stored on the premises are not "similar" to the operating facilities, equipment and supplies of the Terminal but are entirely dissimilar in quality, nature, degree, purpose and other characteristics. They were different in the essential particulars and not adapted to similar use. Therefore, even if liability were established for the goods of others on the premises, no coverage for such liability would exist under the terms of American Equitable Group's explosion policy. This conclusion is fortified by a consideration of the circumstances existing at the time of the execution of the policy and the general nature of Terminal's business. In 1945 at the time of the issuance of the policy the Terminal had large quantities of goods of others on the premises. The policy did not provide for any reporting of or consideration of these goods on

store which at all times far exceeded the value of the Terminal's own property. The policy went into great detail in describing the property of the Terminal that was covered by the policy. To hold that by the use of the term "similar property" in a subsidiary and separate clause it was intended to enlarge many times the coverage of the policy and to reduce consequently the actual loss and damage recovery in the event of loss by reason of the 90% co-insurance clause, is to attribute to the parties an intent wholly inconsistent with the purpose of taking out the insurance. Under the facts as they existed on April 16, 1947, to include the goods of others having a value of $19,-632,143 within the meaning of the words "similar property" and applying the 90% co-insurance clause would be in effect to hold that at the most Terminal had insured its property only to the extent of recovering 10.617% of its loss. On the other hand, limiting the words "similar property" to their proper meaning, the effect would be to include only the operating facilities, equipment and supplies and liability for similar operating facilities, equipment or supplies held by the Terminal but not owned by it. Under all the circumstances and under the wording of the explosion policy, the words "similar property" do not include the property of others on the premises of the Terminal on April 16, 1947.

This conclusion is further supported by the fact that the Terminal's tariffs and warehouse receipts provided that no insurance would be carried on goods of others stored on the premises. Following the reasoning of the decisions above cited as to the controlling effects of the tariffs and particularly Sanford Mfg. Co. v. Western Mutual Fire Insurance Co., supra, the words "similar property" would and must be construed as not including the goods of others stored on the premises.

Since the words "similar property" do not include the goods of others, the question of any actual liability for loss or damage is also immaterial because the policy provision relating to actual liabil-ity covers only actual liability for similar property and not for the goods of others stored on the premises.

Next the question of actual liability for the goods of others is immaterial and not involved here because as has been stated all persons with goods on the premises have been made parties and all those whose property suffered any damage have either defaulted in making a claim or now have affirmatively disclaimed. The rights of the owners of the goods on the premises are not involved. They seek no recovery here. Under these circumstances the only effect of American Equitable Group's contention with respect to its "liability clause" is in connection with the co-insurance clause contained in said policy. This co-insurance provision provides "in the event of loss this Company shall be liable for no greater proportion thereof than the amount hereby assured bears to 90% of the actual cash value of *the property described herein* at the time when such loss shall happen." The effect of American Equitable Group's contention is to add the alleged liability for loss or damage to goods of others to the value of Terminal's property and then apply the 90% co-insurance clause to the total. Without the application of the co-insurance clause to the claimed "liability" for loss or damage to goods of others, the question of Terminal's liability for the loss or damage to goods of others has no effect in this case because of the disclaimers and defaults of the owners of the goods on the premises. If the co-insurance clause does not apply to the claimed liability for loss or damage to the goods of others the question of coverage of Terminal's liability for loss and damage has no materiality here. Do the words *"property described herein"* contained in the co-insurance clause cover and include "liability" for goods of others? The answer is "No". In the cases previously cited, Globe & Rutgers Fire Insurance Company v. United States, supra; In Re Podolsky, supra; and McCoy v. Home Insurance Co., supra, a clear distinction has been made between

property and liability. Under the policy as written the co-insurance clause is found, with a few intervening paragraphs not material here, immediately after the policy provisions describing the Terminal's insured property. The "liability" clause comes after the co-insurance clause. From a reading of the policy, it is clear that the words "property described herein" in the co-insurance clause refers only to the property of the Terminal. The Terminal's property is the only *property* described or mentioned in the policy. It would be straining the meaning of the words in the policy most unwarrantably to hold that the *"property described herein"* in addition included the insured's "liability for similar property." In fact "liability" is the very antithesis of "property". As stated in Re State Tax on Foreign-Held Bonds, 15 Wall. 300, 82 U.S. 300, 21 L.Ed. 179, at page 320: "To call debts property of the debtors is simply to misuse terms." Equally so, to say that "liability" is included in the term "property described herein" is to misuse the term. Again to hold that "liability" for the goods of others is included within the term "property described herein" would cause serious confusion as to the amount to be recovered under a policy. Here, if the Terminal be not liable for the goods of others, the "property described herein" means only the Terminal's property; if the Terminal be liable for the goods of others, under American Equitable Group's contention, "property described herein" would include Terminal's property and in addition the "liability" of the Terminal for goods of others. The term "property described herein" has a definite meaning under the policy and that it refers only to the Terminal's property and does not include and cover any liability for goods of others.

For still another reason, the question of liability of the Terminal for the goods of others has no place here.

As has been stated no owner of goods on the premises is now claiming any benefits under the explosion policy. Defaults or disclaimers have removed such owners from the case. Insofar as American Equitable Group is concerned, in effect it now seeks to substitute itself for the owners of the goods and claim that Terminal is liable. Even though the owners suffering the damage fail to claim liability on the part of the Terminal, American Equitable Group, on a claim that liability exists, seeks to reduce Terminal's recovery under the explosion policy. But the right to assert liability exists only in the owners; the owners do not now do so. Not doing so, and having either defaulted in making a claim or having disclaimed, no liability now exists to the owners of the goods and consequently there is no basis for American Equitable Group's contention that liability does exist and that this claimed liability must be taken into consideration in connection with the co-insurance clause to reduce Terminal's claim.

The above discussion and conclusions have been based upon the assumption that American Equitable Group plead and proved actual liability on the part of Terminal for the loss and damage to goods of others. However, this is not correct. American Equitable Group, taking the position that the burden of proof was on the Terminal to prove no liability, in its amended original answer on which it went to trial alleged in this connection only the terms of the "liability" clause, that on April 16, 1947, there were on the lands of the Terminal and in its warehouses, buildings and railroad cars vast quantities of commodities of a large value, that plaintiff Terminal sought to ignore this "phase of the underwriting" and the rights of the owners of said goods; that such goods were insured under the policy sued on and that such owners are "proper, essential and indispensable and necessary parties" and that American Equitable Group plead as a defense the failure of plaintiff Terminal to make such owners parties. Subsequent to the filing of this answer, the Aetna Group impleaded all of such owners with the resulting defaults and disclaimers heretofore noted. American Equitable Group's plea of ab-

sence of parties had been satisfied and unless the burden of proof is on plaintiff to affirmatively show no liability for the loss or damage to the goods of others there is no pleading by American Equitable Group to raise the issue of liability. The issue of liability for such loss and damage to goods of others, insofar as the Terminal is concerned, is effective only to diminish Terminal's recovery when taken in connection with the co-insurance clause. A plea, the effect of which is to diminish an insured's recovery and particularly the plea of co-insurance, is defensive and the facts supporting such a plea must be plead and proved by the defendant insurance company. In Home Insurance Company of N. Y. v. Eisenson, 5 Cir., 181 F.2d 416, 419, in a case involving the application of co-insurance, Judge Hutcheson speaking for the Court held that the burden of alleging and proving co-insurance in order to diminish recovery was on the defendant insurance company, saying:

"While appellants (the insurance company), as they were obliged to do, did plead the co-insurance clause in defense, they tried the case on the facts below, they have presented it here, as though the burden were upon appellees to show that they were not co-insurers *instead of, as it was, upon appellants to convince that they were.*" (Italics mine.)

In accord with this rule, in addition to the authorities cited in the above opinion, is New York Underwriters Insurance Company v. Shanks, Tex.Civ.App., 78 S.W.2d 1026, error refused. It was not incumbent on Terminal to prove no liability for loss or damage to the goods of others and the non-application of the co-insurance clause, but on the contrary the burden of pleading and proof of showing liability and the application of the co-insurance clause was on American Equitable Group.

On the question of burden of pleading and proving liability, the burden is on American Equitable Group for still another reason. American Equitable Group contends that the burden is on a warehouseman to prove no liability and American Equitable Group then asserts that it is in the same position as a bailor suing the warehouseman. But American Equitable Group is not in the position of a bailor, particularly since the bailors are making no claim, but even if so, the Texas rule is contrary to American Equitable Group's position. In Texas it is established that in a suit brought by bailor against a bailee, the burden is on the bailor to allege and prove negligence on the part of the bailee; that as a matter of proof if the bailor shows delivery to the bailee and non-delivery back, this makes out a prima facie case, but if the bailee then shows that the property of the bailor was destroyed by fire or explosion or similar event, then the bailee is relieved from responsibility unless the bailor affirmatively shows negligence by the bailee. However, the burden of alleging and proving bailee's negligence is always on the bailor. Exporters' & Traders' Compress & Warehouse Co. v. Schulze, Tex.Com.App., 265 S.W. 133; Mustang Aviation, Inc., v. Ridgway, Tex.Civ.App., 231 S.W.2d 677, error refused, and Trammell v. Whitlock, 150 Tex. 500, 242 S.W.2d 157.

American Equitable Group having failed to plead any facts to show liability of the Terminal for the loss or damage to goods of others, no issue is presented as to such liability. In addition, referring to the issues of negligence requested by American Equitable Group to be submitted to the jury, these issues either have no support in the evidence or if found in favor of American Equitable Group could not be a proximate cause of the loss suffered. Also the requested issues were erroneous and not in any form to be submitted to the jury. In this discussion of liability, no mention has been made of the Aetna Group because the Aetna Group did not plead. prove or otherwise contend that any actual liability on the part of the Terminal

existed as to the loss and damage to goods of others.

Terminal further seeks to recover interest on its recovery under American Equitable Group's explosion policy from July 16, 1947, the date on which American Equitable Group denied liability under its explosion policy, to the date of entry of judgment. American Equitable Group not having denied liability on its fire policy and the Terminal having waived interest under the Aetna Group fire policies, no question is presented as to recovery of interest under the fire policies.

 As to American Equitable Group's explosion policy, American Equitable Group denied liability under the explosion policy on July 16, 1947. This matured Terminal's claim under the explosion policy and interest commenced running at that time. In Delaware Underwriters v. Brock, 109 Tex. 425, 211 S.W. 779, 782, in a suit on a fire policy, the Texas Supreme Court held:

"It is the settled law of Texas that such a denial does mature the demand for loss or damage under a fire policy. [Georgia Home] Ins. Co. v. Jacobs, 56 Tex. [366] 372; [Hartford Fire] Ins. Co. v. Josey, 6 Tex.Civ.App. 290, 25 S.W. [685] 686; [Oklahoma Fire] Ins. Co. v. McKey (Tex.Civ.App.), 152 S.W. [440] 441; [Camden Fire] Ins. Co. v. Bomar (Tex.Civ.App.), 176 S.W. [156] 157. *And under such circumstances, interest would run from the date of denial of liability,* regardless of whether 60 days had expired after proofs of loss had been furnished, and regardless of whether proofs of loss were waived." (Italics mine.)

The Texas decisions are uniform on this point and hold that in a suit upon an insurance policy, interest on any recovery had upon such policy commences to run from the date of denial of liability under the policy. Great American Insurance Co. v. D. W. Ray & Son, Tex.

Com.App., 15 S.W.2d 223, rehearing denied 17 S.W.2d 779; Home Insurance Company of New York v. Puckett, Tex. Com.App., 27 S.W.2d 111, opinion approved; Central Federal Fire Insurance Company v. Lewis, Tex.Com.App., 44 S. W.2d 936; Pennsylvania Fire Insurance Company v. W. T. Waggoner Estate, Tex. Com.App., 39 S.W.2d 593; Boston Insurance Company v. Rainwater, Tex.Civ. App., 197 S.W.2d 118. This rule has been followed in this circuit—St. Paul Fire & Marine Insurance Company v. Garza County Warehouse & Marketing Ass'n, 5 Cir., 93 F.2d 590. In the absence of a denial of liability, interest is allowed commencing sixty days after proof of loss is filed or waived—Security National Fire Insurance Company v. Gulf Insurance Company, Tex.Com.App., 41 S. W.2d 17, and Hanover Insurance Company of New York v. Stevenson, 127 Tex. 186, 90 S.W.2d 822. American Equitable Group contends that interest should be denied because of the long lapse of time from the time the suit was removed to this Court, September 10, 1947, to time of trial which commenced on October 11, 1954. However, the Texas decisions in suits on insurance policies have failed to make any such exception and under Texas law Terminal is entitled to interest on the recovery on the explosion policy from the date of denial of liability. In addition, this suit was originally removed to this Court on September 10, 1947, having been filed against American Equitable Group on the explosion policy only. These companies on December 29, 1947, filed a Third-Party Counter-Claim impleading the Aetna Group fire companies. On January 20, 1948, the Aetna Group filed motions to strike which were denied on March 15, 1948; the Aetna Group then impleaded all owners of goods on the premises. The case remained very active with numerous motions, requests for admissions and other pleadings being filed and heard by the Court, with this series of motions, answers and other matters, keeping the case active until at least October 29, 1949. Throughout this

time the notation on the Court's docket sheet on each call of the docket is generally the same as the entry made on June 6, 1949—"Not at issue as to all parties—Passed." At the call of the docket on June 5, 1950, the case was "Passed acct. of Texas City case", meaning that a judgment had been entered in this Court against the United States in a consolidated suit by all parties sustaining loss or damage in the Texas City Disaster, including both Terminal and American Equitable Group, in favor of such parties. The case was then passed awaiting outcome of the tort claim suit against the Government. The Supreme Court, on June 8, 1953, held the United States not liable for the damages caused by the disaster, Delehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427. On July 13, 1953, Terminal requested conferences with all parties in an effort to stipulate values, loss and damage and other matters. These conferences continued and all parties were active in trial preparation. Considering the nature of the case, the multitude of parties (all brought in either by American Equitable Group or the Aetna Group), the volume of testimony and the necessary lapse of time in preparing for trial in such case, no delay can be charged to Terminal up until June 1950 and from July 13, 1953, to date. The only delay would be from June 1950 to July 13, 1953. American Equitable Group charges Terminal with this delay on the grounds that Terminal sought to recover its entire loss on both insured and uninsured properties from the United States. However, American Equitable Group at the least acquiesced in this delay and did not seek a trial. The delay was equally for the benefit of American Equitable Group in that American Equitable Group was also a party to the tort claim suit and seeking to recover against the United States with the obvious belief that if the Terminal received complete recovery against the United States this would obviate the necessity in whole or in part of American Equitable Group paying Terminal the amounts owed by American Equitable Group. Under these circumstances there is no basis for denying Terminal interest even if such could be done under Texas law. However, under the Texas decisions above cited, it is not believed that the court has any discretion to disallow interest and that interest follows as a matter of law. Ewing v. Wm. L. Foley, Inc., 115 Tex. 222, 280 S.W. 499, 44 A.L.R. 627; Texas & New Orleans R. Co. v. Dingfelder & Balish, 134 Tex. 156, 133 S.W.2d 967; AAA Air Conditioning & Mfg. Corp. v. Barr, Tex. Civ.App., 186 S.W.2d 825, error refused; and Eugene B. Smith & Co. v. Russek, 5 Cir., 212 F.2d 338. This is particularly true when it is considered that, independent of the Texas decisions above cited, under the provisions of the Texas Statutes, Terminal, as a matter of law, is entitled to recover interest.

Article 5070 of the Texas Revised Civil Statutes provides:

"Art. 5070. 4977–4978 Legal rate applicable

"When no specified rate of interest is agreed upon by the parties, interest at the rate of six per cent per annum shall be allowed *on all written contracts ascertaining the sum payable,* from and after the time when the sum is due and payable; and on all open accounts, from the first day of January after the same are made. Acts 1892, p. 4; G.L. vol. 10, p. 368." (Italics mine.)

It has been uniformly held in Texas that suits to recover upon an insurance policy are suits upon "written contracts ascertaining the sum payable" within the meaning of Article 5070.—Federal Life Insurance Company of Chicago v. Kriton, 112 Tex. 532, 249 S.W. 193; American National Insurance Company v. Fulghum, Tex.Civ.App., 177 S.W. 1008; Alliance Insurance Company v. Continental Gin Company, Tex.Civ.App., 274 S.W. 299—reversed on another point, Tex.Com.App., 285 S.W. 257, and Federal Underwriters Exchange v. Smith, Tex.Civ.App., 145 S.W.2d 897. Interest being allowed by statute, it is recoverable as a matter of law.

█ Terminal is therefore entitled to recover interest from American Equitable Group upon all sums adjudged due and payable under the explosion policy No. R 35–7509, from July 16, 1947, to the date of entry of judgment.

Finally, it is contended by American Equitable Group that insofar as American Equitable Group's fire policy is concerned, the fire policies of the Aetna Group constitute contributing insurance and that both the American Equitable Group fire policy and the Aetna Group fire policies should contribute to the total fire loss in accordance with the pro-rata clause of the particular policies. The insuring clause contained in the Aetna Group fire policies appears on its face to cover "on all property of every description * * *". The Aetna Group policies also contain a provision to the effect that "it is understood and agreed that this policy does not cover * * * property more specifically insured."

On the other hand, the American Equitable Group fire policy covers the following described property:

"Pier 'O' bulkhead and wharf aprons; Pier 'A'; bulkhead, and wharf aprons; Pier 'B', bulkhead and wharf aprons; Wharf 'C', bulkhead and wharf aprons; Wharf 'D', bulkhead and wharf aprons; Wharf 'E', bulkhead and wharf aprons; bulkhead 1200′ long; Wharf apron 1200′ long; bulkhead 210′ long; oil dock 990′ long; two (2) Highland Bayou bridges; railroad tracks; locomotive; cotton compress machinery and boiler room situate between Piers 'A' and 'O'; telephone and transmission lines; trucks, tractors for handling freight; all situate at or near Texas City, Galveston County, Texas."

█ The Aetna Group policies appear to be blanket policies and within the meaning of the Aetna policy, the property described in the American Equitable Group fire policy is "property more specifically insured." Therefore, American Equitable Group's plea that the Aetna Group policies are contributing insurance should be denied—Firemen's Fund Insurance Co. v. Western Refrigerating Co., 162 Ill. 322, 44 N.E. 746; Peabody v. Liverpool & London & Globe Insurance Co., 171 Mass. 114, 50 N.E. 526; Hartford Steam Boiler Inspection & Insurance Co. v. Fireman's Mutual Insurance Co., 110 Conn. 332, 148 A. 135, and Hale v. Central Manufacturers Mutual Insurance Co., Mo.App., 93 S.W. 2d 271.

Turning now to the position of the Aetna Group, each of the eight fire policies issued by the Aetna Group is identical. Each policy covers the risk of fire and contains a 90% co-insurance clause. The total face value of these eight policies is $1,450,000. Each policy has a coverage clause reading as follows:

"On all property of every description, including improvements and betterments to buildings and premises and on records, books of records, manuscripts and drawings for not exceeding their value blank, plus the cost of transcribing, belonging to the assured or held in trust or on commission, or on consignment, or on joint account with others, or held on storage, or for repairs, or the property of others for which the assured may be liable in the event of loss or damage, all situate at or near Texas City, Galveston County, Texas."

It is the position of the Aetna Group that this coverage includes the actual cash value of the Terminal's property covered by the policies of $2,991,069 and the property of others of a value of $19,632,143.20, making a total value of $22,623,212.20; that giving effect to the 90% co-insurance in said policies the ratio of insurance in effect ($1,450,000) to 90% of the actual cash value is 7.121%; that the fire damage to Terminal's property covered by said policies was $207,850 and that plaintiff in its own behalf and for damage to its own property should recover against said companies 7.121% of $207,850 or $14.801.

 The coverage clause in the Aetna Group fire policies is in itself sufficient as a basis to cover the goods of others. Home Insurance Company v. Baltimore Warehouse Company, 93 U.S. 527, 23 L.Ed. 868; Globe and Rutgers Fire Insurance Co. v. United States, 5 Cir., 202 F.2d 696, and in this respect Aetna Group's position is different from the American Equitable Group's position. However, some of the reasons given above for concluding that American Equitable Group's explosion policy does not cover the goods of others are equally applicable to the Aetna Group policies. The tariffs and warehouse receipts are equally binding. Sanford Mfg. Co. v. Western Mutual Fire Insurance Co., 229 Iowa 283, 294 N.W. 406, and Baltimore & Carolina S. S. Co. v. United States Merchants & Shippers Insurance Co., 159 Md. 641, 152 A. 491, are equally applicable. Extrinsic evidence is admissible to show what goods were insured and what were not. The Aetna Group policies are third-party beneficiary contracts and the beneficiaries may reject the benefits of such a contract. Stillwell v. Staples, 19 N.Y. 401, and Pittman v. Harris, 24 Tex.Civ.App. 503, 59 S.W. 1121. Therefore, under the facts of this case the Aetna Group policies did not cover the goods of others on the premises.

Costs of suit are adjudged in favor of plaintiff and against the defendants, jointly and severally, in proportion to the amount of dollar judgment so adjudged against each defendant, respectively, exclusive of the amount adjudged as interest, and the respective defendants shall have judgment against all other defendants to enforce contribution to the payment of costs in the proportions adjudged.

Judgment consistent with this opinion was entered and filed with the Clerk on April 1, 1955. Copies of this opinion will be forwarded to all counsel of record by the Clerk.

On the Motion for New Trial:

On April 11, 1955, Motion for New Trial was filed by American Equitable Group, assigning 51 reasons therefor. Plaintiff Terminal has filed its reply in opposition and Aetna Group has filed its opposition to the motion.

This opinion covers the principal points raised by American Equitable Group in its Motion for New Trial and a further discussion thereof would be repetitious and would unduly extend this opinion.

The Motion for New Trial is denied and overruled for the reasons outlined in the opinion. Clerk will notify counsel to draft and submit appropriate order.