WEBB, APPELLEE AND CROSS-APPELLANT, *v.* GRIMM; BUCKEYE UNION CASUALTY CO. ET AL., APPELLANTS; AMERICAN INSURANCE CO., CROSS-APPELLEE.*

*Motion to certify the record overruled (37291), December 20, 1961.

(No. 2603—Decided June 15, 1961.)

*Messrs. Burtner, Brenton & Selva,* for appellee and cross-appellant.

*Messrs. Landis, Ferguson, Bieser & Greer,* for appellant Buckeye Union Casualty Company.

66

*Messrs. Harshman, Young, Colvin & Alexander*, for appellant Hoosier Casualty Company.

*Messrs. Holzfaster, Hoefling & Cecil*, for cross-appellee American Insurance Company.

SHERER, J. This case originated in the Common Pleas Court of Montgomery County, Ohio, by the filing of a petition by the plaintiff, Arthur Webb, against Mad River Milk Producers, Inc., Beatty Motor Sales, Glenn Robison and John B. Grimm, for damages for injuries claimed to have been sustained in an automobile accident.

All the defendants excepting Grimm were dismissed before or during trial and a judgment was then rendered in favor of the plaintiff, Arthur Webb, and against the defendant Grimm for $40,000. When that judgment remained unsatisfied, Webb filed a supplemental petition against Buckeye Union Casualty Company, Hoosier Casualty Company and American Insurance Company. At the time of the collision, Buckeye Union Casualty Company had in force a contract of insurance with Robison, Hoosier Casualty Company had in force a contract of insurance with Mad River Milk Producers, Inc., and American Insurance Company had in force a contract of insurance with Beatty Motor Sales.

The trial court, upon the issues joined by Webb's amended supplemental petition and the answers of Buckeye Union Casualty Company, Hoosier Casualty Company and American Insurance Company, made findings of fact and conclusions of law from the evidence and briefs of counsel and rendered judgment on June 6, 1960, in favor of plaintiff Webb against defendants Buckeye Union Casualty Company and Hoosier Casualty Company. The trial court absolved the defendant American Insurance Company from any liability to plaintiff Webb.

Thereafter, defendants Buckeye Union Casualty Company and Hoosier Casualty Company filed motions for new trial and for judgment *non obstante veredicto*, which motions were overruled by the Common Pleas Court. Both then filed a notice of appeal from the judgment of the Common Pleas Court of June 6, 1960, and from the order of August 4, 1960, overruling their motions for new trial and for judgment notwithstanding the verdict.

Plaintiff Webb filed a motion to set aside the judgment in favor of American Insurance Company, and to enter judgment in favor of plaintiff against that defendant, or, in the alternative, to grant plaintiff a new trial against American Insurance Company for the reason that the judgment in its favor is contrary to law and the evidence. The trial court overruled both motions. Appellants seek final judgment in this court.

The undisputed facts, in brief, are as follows: Prior to June 1957, John Grimm and Glenn Robison operated separate milk routes and hauled cans of milk into Dayton. In June 1957, Robison orally agreed to sell his route to Grimm for $5,000, if Grimm could get the money. It was agreed between them that Grimm was to drive Robison's Dodge truck on the route, paying for the gas and oil. Prior to the sale, Robison would haul milk into Dayton and the dairy would pay the farmers for their milk and would send a check to Robison for his commission on the milk delivered. After Grimm took over Robison's route the dairy continued to send Robison a check for commissions on milk delivered by Grimm from Robison's route. It was agreed that these latter commissions would be credited on Grimm's $5,000 obligation to Robison until Grimm could raise the balance of the purchase price. Grimm had a farm sale in early September 1957 in order to raise money to pay Robison. Up to this time, Robison received approximately $2,000 from Grimm by collection of commissions on milk delivered by Grimm from the route sold. It was agreed by Robison and Grimm that Robison was to retain title to the Dodge truck until the full amount of the purchase price of $5,000 was paid. The title to this truck was in the name of Robison at the time of the accident which is the subject of this action.

It was further agreed by Robison and Grimm that during the time Grimm was having his sale Robison was to drive the Dodge truck and collect the milk from the route sold and deliver it to Dayton. Robison was driving his Dodge truck in accordance with his agreement with Grimm on September 4 and 5, 1957. On September 4, 1957, the transmission of the Dodge developed trouble and Robison had it taken to Beatty Motor Sales for repair. Robison then called John L. Yoder, who was connected with Mad River Milk Producers, Inc., and obtained permission to use a Ford truck owned by that company to replace the Dodge.

68

Robison drove the Ford all day on September 4 and 5, 1957, collecting milk on the route he had agreed to sell to Grimm. On the evening of September 5, 1957, Robison and Grimm picked up the Dodge and Robison returned the Ford truck belonging to Mad River Milk Producers, Inc., to Hostetler's Filling Station in West Liberty, where it had been obtained. Grimm drove the Dodge truck in the evening of September 5, 1957, and noted that the gears clashed. On the morning of September 6, 1957, Robison and Grimm went out to collect milk in the Dodge and gear trouble developed. They took it to Beatty's again, transmission adjustments were made and Grimm drove it away alone toward Dayton with a load of milk. En route to Dayton the transmission rumbled and quit.

Grimm then called the residence of Robison, but was unable to reach him. He talked briefly with Mrs. Robison. Following this conversation, Grimm called Beatty Motor Sales. Employees of Beatty Motor Sales then came with a wrecker to the place where the Dodge was and brought the Ford truck belonging to Mad River Milk Producers, Inc., which Robison had used on the previous day. The milk was transferred from the Dodge to the Ford and Grimm proceeded toward Dayton. As Grimm neared Dayton in the Ford truck he collided with the plaintiff, Arthur Webb, and caused him injuries which gave rise to the judgment which is the subject of this appeal.

The court's judgment herein was predicated upon findings of fact and conclusions of law, not requested by a party herein but which are a part of the court's judgment in this case.

First, we will consider the question of the liability of Buckeye Union Casualty Company under its policy issued to Robison. The trial court awarded judgment in favor of plaintiff Webb, against Buckeye Union Casualty Company and Hoosier Casualty Company in the sum of $40,000.

For its assignments of error herein, Buckeye Union Casualty Company says that the trial court erred in the following

(1) In overruling this defendant-appellant's motions for judgment and in granting judgment in favor of plaintiff-appellee against this defendant-appellant which was against the evidence and was contrary to law.

(2) In giving judgment in favor of American Insurance Company.

(3) In failing to find that even if there was any coverage under the policy of this defendant-appellant, Buckeye Union Casualty Company, that was excess insurance only.

Plaintiff contends that Buckeye Union is liable under its policy with Robison because Grimm was operating the Dodge with the permission of Robison and that he was operating the Mad River truck on September 6, 1957, as a substitute vehicle with the implied permission of Robison and with the permission of Mrs. Robison, his spouse.

This policy provides, under "Insuring Agreements:"

"III. Definition of Insured (a) * * * the unqualified word 'insured' includes the named insured, * * * and also includes any person while using the automobile and any person * * * legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or such spouse or with the permission of either * * *."

Article IV, subsection 3, of the policy provides:

"Temporary substitute automobile—Under coverage A, B and division 1 of coverage C, an automobile not owned by the named insured or his spouse, if a resident of the same household, while temporarily used as a substitute for the described automobile when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction."

Plaintiff and defendant, Buckeye Union, entered into a stipulation of facts herein, which was as follows:

"It is stipulated by and between counsel for plaintiff and counsel for defendant, The Buckeye Union Casualty Company that if Kent Atha were called to testify he would state as follows:

"That at all times mentioned in plaintiff's supplemental petition he was an agent for The Buckeye Union Casualty Company and that some time prior to August 31, 1957, Glenn Robison, of Zanesfield, Ohio discussed with him the renewal of policy OA-777840 which was to expire September 1, 1957. That Mr. Robison advised Mr. Atha that he was negotiating with John B. Grimm of 221 Fenwick Drive of New Carlisle, Ohio for the sale of his 1954 Dodge 2¾ ton milk truck to Mr. Grimm but that the deal would not be made until Mr. Grimm could raise some money and as Policy OA-777840 was expiring on September 1, 1957, Mr. Atha agreed to bind coverage for a period of ten days start-

ing September 1 and on August 31, 1957 Mr. Atha requested Buckeye Union Casualty Company to bind the expiring policy for a period of ten (10) days, that prior to expiration of the binder, Mr. Atha issued policy OA-1-011-510 to Glenn Robison on the 1954 Dodge 2¾ ton milk truck and the premium of one hundred forty four dollars ninety five cents ($144.95) was paid on September 9, 1957 by Mrs. Glenn Robison, that on September 25, 1957, Glenn Robison requested an assignment of interest endorsement on policy No. OA-1-011-510 in favor of John B. Grimm of New Carlisle, Ohio and this was issued on that date.''

Buckeye Union contends Grimm was not ''using the automobile'' (which was the Dodge) and was not using either the Dodge or Ford with the permission of the named insured, Robison, or his spouse.

We find that the judgment of the trial court that Grimm was using the Dodge with the permission of Robison and was using the Ford of Mad River as a temporary substitute vehicle within the terms of this appellant's policy is amply supported by the evidence.

First, the evidence is that in July 1957 Robison sold his milk route to Grimm if he could raise the money. Second, the evidence is that Grimm was to go ahead and drive Robison's Dodge on Robison's route, pay the gas and oil, the truck to remain in Robison's name until Grimm could raise the purchase price. Third, the evidence is that the deal was completed on September 12, 1957, by the payment by Grimm of the balance of the purchase price. Fourth, the evidence is that when the agreement between Robison and Grimm was made in July 1957 Robison agreed that Grimm was to use Robison's license and insurance on the Dodge truck until the deal was completed. Fifth, that between July 1957 and September 12, 1957, both Robison and Grimm exercised some control over the Dodge truck. Sixth, that between July 1957 and September 12, 1957, Robison obtained the gross receipts from the milk route, Grimm paying all expenses. Seventh, Robison had repairs and adjustments made on the Dodge both before and after the accident on September 6, 1957. Eighth, Robison chose Beatty Motor Sales for this purpose and paid one of the bills, for which he was reimbursed by Grimm at the time of their final settlement on September 12, 1957. Ninth, while Grimm was having a farm sale to raise th

balance of the purchase price on September 3, 4 and 5, 1957, Robison operated the Dodge on the milk route, for which he was paid $100 by Grimm on September 12, 1957. Tenth, on September 5, 1957, the Dodge broke down and Robison had it repaired at Beatty's and obtained permission of Mad River Milk Producers, Inc., to use their Ford truck while his Dodge was being repaired. Eleventh, after being advised of the accident on September 6, 1957, Robison notified Mad River that their truck had been involved in an accident and at their suggestion a report was made by Grimm thereof to their insurance company, to a Mr. King. Twelfth, on the morning of September 6, 1957, Robison and Grimm alternately drove the Dodge which had been repaired the previous day by Beatty's and experienced difficulty shifting gears which had just been repaired by Beatty's. Robison took the Dodge to Beatty's for adjustments and he and Grimm started off in the Dodge again. Robison and Grimm had collected several thousand pounds of milk during several hours on the morning of September 6, 1957, all of which was on the truck when Robison turned the truck over to Grimm and told him to take it to Dayton. It was during the difficulty with the gears on September 6, 1957, that Robison said to Grimm, "We may have to get the Mad River truck again."

Thirteenth, Robison and Beatty's men picked up the Mad River Ford at Dayton on September 7th following the accident on September 6th, had it repaired by Beatty's and he and Grimm used it to collect milk while the Dodge was being repaired again by Beatty's.

The trial court had a right to weigh and consider what Mrs. Robison said to Grimm in the light of the information given her and questions asked her by Grimm and had a right to consider it along with all the other evidence in the case bearing upon this issue.

Buckeye Union further argues that Grimm was using the Dodge truck as a matter of right under his contract of purchase and not by permission of Robison. We have examined and considered the evidence bearing on this question, together with the authorities cited by counsel, and are satisfied that the trial court's findings of fact that Robison permitted Grimm to use the Dodge and that Grimm had implied permission from Robison and permission from Mrs. Robison to substitute the Mad River

Ford for the Dodge on September 6, the date of the accident, are sustained by the evidence.

The evidence is that Robison agreed to sell his route to Grimm "if he could get the money." The stipulation of facts entered into by plaintiff and Buckeye provided, "That Mr. Robison advised Mr. Atha that he was negotiating with John B. Grimm of 221 Fenwick Drive of New Carlisle, Ohio, for the sale of his 1954 Dodge 2¾ ton milk truck to Mr. Grimm but that the deal would not be made until Mr. Grimm could raise some money."

The next question to be determined is whether Buckeye's policy with Robison provided coverage for Grimm on September 6th when he was operating an automobile not owned by Robison in furtherance of their joint enterprise carried on for their mutual benefit.

Under Insuring Agreements, Section III, Definition of Insured, the policy provides:

"(a) With respect to the insurance for bodily injury liability * * * the unqualified word 'insured' includes the named insured and, if the named insured is an individual, his spouse if a resident of the same household, and also includes any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or such spouse or with the permission of either."

Under Insuring Agreements, Section IV, subsection 3, Temporary Substitute Automobile, the policy defines automobile:

"Under coverages A, B and division 1 of Coverage C, an automobile not owned by the named insured or his spouse if resident of the same household, while temporarily used as a substitute for the described automobile when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction."

Under Insuring Agreements, Section I, Coverage A—Bodily Injury Liability, the policy provides:

"To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the ownership, maintenance or use of the automobile."

The trial court, in its conclusions of law, followed the doctrine established by the Supreme Court of Ohio in the case of *Garlick, Admr.*, v. *McFarland, a Minor*, 159 Ohio St., 539, wherein paragraph three of the syllabus states:

"Where an automobile is sold by the owner, with full payment of the agreed price and delivery of possession to the purchaser thereof but the assignment and delivery of the certificate of title are deferred, a change in the ownership of the automobile is not consummated in accordance with the provisions of the Ohio Certificate of Title Act and coverage of such automobile by an insurance policy issued to the owner thereof continues in force until the consummation of the sale by assignment and delivery of the certificate of title."

In accord are *Motorists Mutual Ins. Co.* v. *Auto Owners Mutual Ins. Co.*, 103 Ohio App., 18, and *Brewer* v. *DeCant*, 167 Ohio St., 411.

We have considered the evidence bearing upon the issues between plaintiff and defendant Buckeye Union and the law applicable, and hold that the judgment in favor of plaintiff against this defendant is sustained by sufficient evidence and is not contrary to law. This defendant's first assignment of error is without merit.

We will discuss this defendant's second assignment of error later.

Buckeye's third assignment of error is that the trial court erred in failing to find that even if there was coverage under Buckeye's policy, that was excess insurance only. Buckeye points to the provision in its policy under "Conditions."

"20. Other Insurance * * * provided, however, * * * the insurance with respect to temporary substitute automobiles under Insuring Agreement IV * * * shall be excess insurance over any other valid and collectible insurance."

Plaintiff argues that the issue "excess coverage" as a defense was not before the trial court under the issues made up by the pleadings.

We find no merit in this assignment of error. This issue was not presented to the trial court in the pleadings. This defendant made no objection to the form of the judgment between the time the court made its findings of fact and conclusion of law and the time the judgment entry was journalized. Neither

did that defendant assert this claimed error in its motion for new trial. The theory upon which this case was tried by Buckeye was that its policy provides no coverage. This defendant cannot introduce a new element in this case on appeal. *Parks* v. *Ringer*, 107 Ohio App., 283, 287. In 3 American Jurisprudence, 372, Section 830, it is stated:

"The well-settled rule which requires the parties to adhere on appeal to the theory upon which they presented the case in the trial court, operates to limit the scope of the review * * * the case, on appeal, must be reviewed and decided on the theory on which it was tried in the court below * * *."

In *Goldberg* v. *Industrial Commission*, 131 Ohio St., 399, the Supreme Court, in paragraph four of the syllabus, said:

"Ordinarily reviewing courts do not consider questions not presented to the court whose judgment is sought to be reversed."

The question of primary and secondary coverage presumes that coverage exists. If there is any question about the extent of coverage afforded after Grimm's right to coverage is finally determined, the companies involved may seek a determination of that question (*Aetna Casualty & Surety Co.* v. *Buckeye Union Casualty Co.*, 157 Ohio St., 385; *United States Fidelity & Guaranty Co.* v. *Nationwide Mutual Ins. Co.*, 82 Ohio Law Abs., 242) as that controversy would be entirely between those companies who are found to afford coverage. The insured or judgment creditor is not a necessary party to such a controversy. Paragraph three of the headnotes in *United States Fidelity & Guaranty Co.* v. *Nationwide Mutual Ins. Co.*, *supra*.

Buckeye does not claim that the failure of the trial court to find that coverage, which it contends does not exist, is excess was prejudicial, and it could not, because it has a right of recovery, under equitable principles, against the company whose coverage is primary for any money paid by it, *Aetna Casualty & Surety Co.* v. *Buckeye Union Casualty Co.*, *supra* (157 Ohio St., 385), paragraph one of the syllabus, but as long as each of these companies disclaims coverage, there is no established "valid and collectible insurance." *Aetna Casualty & Surety Co.* v. *Buckeye Union Casualty Co.*, *supra*, 391.

In 46 Corpus Juris Secundum, 347, Section 1294, it is said:

"Matters reducing the company's liability must be specially pleaded by alleging the applicable clause of the policy and the

facts showing in what manner and in what amount the liability should be reduced."

In *Campbell, Admx.,* v. *Great Eastern Casualty Co.,* 73 Pa. Sup., 333, the court held:

"* * * the defense of proportionate liability, under the terms of the policy, will not be allowed where no such defense is raised in the affidavit of defense."

In accord is the case of *Texas City Terminal Ry. Co.* v. *American Equitable Assurance Co. of New York,* 130 F. Supp., 843.

The Supreme Court, in *Aetna Casualty & Surety Co.* v. *Buckeye Union Casualty Co., supra,* states the rights of Buckeye when it said in the first paragraph of the syllabus:

"Where the operator of an automobile is covered with respect to negligent operation thereof by two insurance policies issued by different companies * * * the company which carries the secondary insurance may, after reasonable notice to the other company, effect reasonable settlement of the action and, upon general equitable principles, may recover from a carrier of the primary coverage the amount so expended within the limits of that policy."

We have examined the entire record, in our consideration of all the errors assigned by defendant Buckeye Union Casualty Company to plaintiff's judgment against it, and find no error prejudicial to the substantial rights of that defendant. Having held that the judgment is sustained by sufficient evidence and is not contrary to law, as to defendant Buckeye Union Casualty Company the judgment will be affirmed.

Defendant Hoosier Casualty Company, also an appellant herein, assigned five errors in the trial court's judgment. Hoosier's first assignment of error is that certain findings of fact embodied in the judgment entry of June 6, 1960, are not supported by the evidence. This defendant refers specifically to three findings of fact which it claims are erroneous and prejudicial. The first of these reads as follows:

"While Grimm was driving the 1954 Dodge to his home he learned that the transmission which he was told by Beatty's had been repaired was not working properly and he conveyed this information to Robison when he met Robison on the morning of September 6, 1957, while Robison and Grimm were collecting

milk from Robison's customers, *and Robison after driving his 1954 Dodge, stated to Grimm that they would have to use the Mad River Ford,* however Robison drove the 1954 Dodge to Beatty's where further work was done and thereafter the transmission appeared to function satisfactory, whereupon Robison told Grimm to finish the route and take the milk on in to Dayton.''

Hoosier contends that the italicized portion of the above finding of fact is clearly erroneous. Hoosier argues that the only testimony in the record on this point is the testimony of Grimm contained in the following questions and answers:

"Q. During the time you and Mr. Robison drove that truck on the morning of September 6, 1957, did you and he experience any difficulty with the transmission on the 1954 Dodge? A. Yes, sir.

"Q. What did Mr. Robison say when he experienced difficulty with the transmission of the 1954 Dodge? A. Mr. Robison was having the same difficulty as I was and he said, 'We may have to get the Mad River truck again.' "

Hoosier objected, and moved to strike what Robison said, claiming that it was hearsay. The trial court overruled Hoosier's objection and motion to strike.

The issues between plaintiff and Hoosier are made up by the pleadings. Plaintiff's amended supplemental petition alleges, in part:

"Plaintiff says that at the time of the accident, defendant, Hoosier Casualty Company, had in full force and effect, its contract of insurance under the terms of which it agreed to pay on behalf of Mad River Milk Producers, Inc., and any person responsible for the use of said Ford milk truck, provided the actual use was with the permission of Mad River Milk Producers, Inc.''

Further, the amended supplemental petition of plaintiff alleges that:

"* * * the actual use of said truck to haul milk to Dayton, Ohio, was with the permission of Mad River Milk Producers, Inc.''

Hoosier's answer admits that it had a contract of insurance with Mad River Milk Producers, Inc., on September 6, 1957; admits that on that date John B. Grimm was driving said

truck; admits that plaintiff had obtained a judgment against Grimm for $40,000 as damages for injuries sustained in an accident on September 6, 1957; but denies each and every allegation contained in plaintiff's amended supplemental petition which it has not admitted to be true.

The first question to be determined is whether the trial court erred in overruling Hoosier's objection and motion to strike Grimm's testimony that Robison told him on the morning of September 6, 1957, that "We may have to get the Mad River truck again." It is clear from the testimony of Robison that he obtained unrestricted permission from the president of the Mad River Milk Producers, Inc., to use their Ford truck to haul milk to Dayton while the Dodge was being repaired and that it was being so used at the time of the accident.

The Hoosier policy defines "insured" as follows:

"The unqualified word 'insured' includes the named insured * * * and also includes any person * * * legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or such spouse, or with the permission of either."

An examination of the record reveals that on the morning of September 6, 1957, Robison did not say to Grimm "that they would have to use the Mad River Ford," but that he did say that "We may have to get the Mad River truck again." The finding, "that they would have to use the Mad River Ford" was the finding of a fact evidentiary in nature. The ultimate fact upon which the court based its judgment is as follows: "Such operation, at the time of the accident, was for the mutual benefit of Robison and Grimm and the driving of the 1955 Mad River Ford was with the implied permission of Robison." Webster's Dictionary says that the word, "would," is sometimes used "in expressing what might be expected."

Plaintiff argues that coverage under Hoosier's policy with Mad River Milk Producers, Inc., is extended to Grimm because Robison had permission of Mad River to use the truck to haul milk to Dayton on September 6, 1957, and that Robison gave implied permission to Grimm to use the Mad River truck on that date to haul milk to Dayton and that the use was in furtherance of the original bailment. Plaintiff relies upon the case of *West* v. *McNamara*, 159 Ohio St., 187, in which the court favors the rule appearing in 160 A. L. R., 1195, 1206:

78

"4. The initial permission given by the named assured to the original permittee includes, according to the better view, the use of the automobile by the second permittee where in so doing the second permittee serves some purpose, benefit, or advantage of the first permittee."

We believe that the trial court was correct in overruling Hoosier's objection to the testimony of Grimm that Robison told him on the morning of September 6, 1957, that, "We may have to get the Mad River truck again." Since Robison, under the terms of Hoosier's policy, could extend coverage thereunder to a second permittee who was using the Mad River Ford for some purpose, benefit, or advantage of his (Robison's), in furtherance of the purposes of the original bailment to the first permittee, his utterances with respect to this issue are competent.

Under the circumstances revealed by the evidence it was not erroneous for the trial court to consider what Robison said as a verbal part of his other acts which we have heretofore enumerated. Robison and Grimm were going down the road in an old Dodge truck with 8,000 pounds of milk aboard; they had been in and out of Beatty's garage for repairs and adjustments; both had a financial interest in getting the milk to Dayton and the Mad River truck was the only milk truck available that they knew about. It is logical and believable that Robison made the statement attributed to him by Grimm. 6 Wigmore on Evidence, 190, Section 1772.

With respect to the admissibility of evidence as an exception to the hearsay rule, the Supreme Court of Ohio in a case involving the admissibility of evidence as a part of the *res gestae*, another exception to the hearsay rule, said in its opinion in the case of *Potter* v. *Baker*, 162 Ohio St., 488, at page 498:

"With respect to the limitation on the spontaneous exclamations exception to the hearsay rule as to 'time of the utterance,' it is stated in 6 Wigmore on Evidence (3 Ed.), 154, Section 1750:

" 'Rulings upon this limitation should not in strictness be given the force of precedents. To argue from one case to another on this question of 'time to devise or contrive' is to trifle with principle and to cumber the records with unnecessary and unprofitable quibbles. There is a lamentable waste of time by

Supreme Courts in here attempting either to create or to respect precedents. Instead of struggling weakly for the impossible, they should decisively insist that every case be treated upon its own circumstances. They should, if they are able, lift themselves sensibly to the even greater height of leaving the application of the principle absolutely to the determination of the trial court.' See also 9 Wigmore on Evidence (3 Ed.), 503, Section 2550.

"This court does not agree with the suggestion that the application of this exception to the hearsay rule or of any of its limitations should be left 'absolutely to the determination of the trial court.' See annotation, 163 A. L. R., 15, 92, 93. However, it would be impossible to lay down hard and fast rules which could solve every question relative to the admission of evidence under the spontaneous exclamations exception to the hearsay rule. This case demonstrates the variety of factors which may be involved in determining whether the circumstances indicate not only a guaranty of truthfulness with respect to a declaration claimed to be admissible as a spontaneous exclamation but also some reasonable basis for concluding that such declaration was based on accurate observations by the declarant. There may be instances in which a decision to reject such a declaration will appear to a reviewing court almost as reasonable as a decision to admit it; and vice versa. We certainly do not believe that the decision of the trial judge in such an instance should be disturbed.

"It is elementary that the trial judge is to decide those questions of fact which must be decided in order to determine whether certain evidence is admissible. 9 Wigmore on Evidence (3 Ed.), 501, Section 2550. But cf. *Smith* v. *Barrick*, 151 Ohio St., 201, 85 N. E. (2d), 101, 8 A. L. R. (2d), 1087. In the instant case, the trial judge, in determining whether this declaration was admissible, necessarily had to decide certain questions of fact. If his decision of those questions of fact, as reflected in his ruling on the admissibility of this declaration, was a reasonable decision, an appellate court should not disturb it. In other words, we believe that the decision of the trial judge, in determining whether or not a declaration should be admissible under the spontaneous exclamations exception to the hearsay rule, should be sustained where such decision appears to be a reason-

able one, even though the reviewing court, if sitting as a trial court, would have made a different decision. Cf. *Schwer, Admx.,* v. *New York, Chicago & St. Louis Rd. Co.,* 161 Ohio St., 15 (paragraph four of the syllabus), 117 N. E. (2d), 696. See also 163 A. L. R., 15, 93 *et seq.*; 127 A. L. R., 1030, 1032.''

The second finding of fact to which Hoosier objects is as follows:

"Grimm was instructed by Mrs. Robison to call Beatty's Garage to tow in the Dodge and bring out the 1955 Mad River Ford."

There being nothing in the trial court's findings of fact and conclusions of law to indicate that the court considered this evidence in determining Hoosier's liability, we must assume that the trial court considered it only for the purpose for which it was competent, *i. e.,* in determining the question of the liability of Buckeye Union Casualty Company.

The record indicates that counsel for plaintiff apprised the trial court that he sought to introduce the testimony of Grimm as to what Mrs. Robison told him in order to prove that the use of the Mad River Ford was with the permission of the spouse of the named insured in the policy of Buckeye Union Casualty Company. Evidence offered must be received if it is admissible as against one of several codefendants but not as against all, if the trial court is apprised of the purpose for which it is admissible. *Totten* v. *Estate of Miller,* 139 Ohio St., 29.

The third finding of fact to which Hoosier takes exception is the following:

"Such operation, at the time of the accident, was for the mutual benefit of Robison and Grimm and *the driving of the 1955 Mad River Ford was with the implied permission of Robison* who had earlier the same day said that they would have to get the Mad River truck *and by Mrs. Robison, his spouse,* who directed Grimm to Beatty's for the purpose of securing the delivery of the 1955 Mad River Ford to Grimm to use to haul the load of milk to Dayton, for which Robison was to receive the income."

Hoosier argues that the italicized portion of this finding obviously shows that the court used the two previous findings of fact to which Hoosier has taken exception in making its finding that Grimm had the implied permission of Robison to use

the Mad River truck at the time of the accident. Had each of the defendants, Buckeye Union Casualty Company, Hoosier Casualty Company and American Insurance Company, requested the trial court to state separately its findings of fact and conclusions of law upon the issues between the plaintiff and each individual defendant and had the court made the findings complained of upon the issues between plaintiff and Hoosier, we might know precisely upon what facts the court based its judgment against Hoosier. However, none of the defendants requested the court to state such findings of fact and conclusions of law herein. The court made findings of fact generally from the evidence and we must assume that in the determination of the issues between the plaintiff and each of the defendants the trial court considered only those separate facts supported by competent evidence and applied the law applicable to the facts found which were pertinent to the separate issues.

The Code provides specific procedure whereby any conclusion of fact or of law of the trial judge may be set apart for the purpose of testing the correctness thereof. Section 2315.22, Revised Code, provides:

"When the questions of fact are tried by the court, its findings may be general for the plaintiff or defendant, unless, before a journal entry of a final order, judgment or decree has been approved by the court in writing and filed with the clerk of the court for journalization, one of the parties requests otherwise, in which case, the court shall state in writing the conclusions of fact found separately from the conclusions of law."

The findings and conclusions of the trial court as to the facts were general in nature and were carried into and made a part of the judgment entry. In the case of *Empire Transportation Co.* v. *Blanchard*, 31 Ohio St., 650, the Supreme Court said:

"The opinion of the court, in deciding a case in which the facts and law are stated generally, can not, by bill of exceptions, be made a substitute for the statement of the 'conclusions of facts found, separately from the conclusions of law,' as required by Section 280 of the Code."

So that, insofar as the liability of Hoosier is concerned, we need to inquire whether the evidence sustains the finding of the trial court that Robison had permission of Mad River to use their Ford truck while his Dodge was being repaired and that

Grimm was operating Mad River's truck at the time of the accident for the mutual benefit of himself and Robison and with the implied permission of Robison. Here, again, the trial court made a finding of ultimate facts and some evidentiary facts. We are satisfied that the trial court's findings of ultimate facts with respect to the issues between plaintiff and Hoosier are sustained by the evidence. We must assume that the trial court applied the law applicable to the facts found from competent evidence upon the issues between plaintiff and Hoosier. Hoosier's first assignment of error is not well taken.

Hoosier's second assignment of error is that the trial court's "conclusion of law that Grimm should be considered an insured of the Hoosier Casualty Company is erroneous." Hoosier argues that Grimm never received any permission to use the Mad River truck at the time of the accident from either Mad River or Robison, who had permission from Mad River to use their truck while his truck was being repaired. It is not disputed that Mad River permitted Robison to use their truck for the purpose of collecting and hauling milk to Dayton while Robison's truck was being repaired and that Robison was so using this truck on September 4 and September 5, 1957. The trial court found that Mad River's consent to Robison was without any reservations. The trial court further found that Grimm had implied permission from Robison to use the Mad River truck on September 6, 1957, the date of the accident, and that on that occasion Grimm was using the truck for the mutual benefit of himself and Robison. We have said that these findings of fact are sustained by the evidence. We have heretofore referred to the case of *West* v. *McNamara, supra,* in which the Supreme Court favored the rule appearing in 160 A. L. R., at page 1206:

"4. The initial permission given by the named assured to the original permittee includes, according to the better view, the use of the automobile by the second permittee where in so doing the second permittee serves some purpose, benefit, or advantage of the first permittee."

In the case of *United Services Automobile Assn.* v. *Russom,* 241 F. (2d), 296, the United States Court of Appeals, Fifth Circuit, discusses the right of a second permittee to use an automobile of the named insured. In discussing the case of *Fox* v. *Crawford,* 50 Ohio Law Abs., 553, the United States Circuit Court of Appeals said:

"If Ohio law is the governing standard, then *Fox* v. *Crawford*, Ohio App., 80 N. E. (2d), 187, 189, does not, as United insists, forbid implied authorization. Portions of the opinion perhaps declare that the named assured may only give express permission to a user to allow others to use the car. But from the opinion as a whole, it is clear that all the case stands for is that authority in the permittee to allow use by a sub-permittee will not be implied merely from the original grant of permission by the named assured. But it does not remotely hold that authority may not be implied. For it recognizes that it is but a question of agency and '* * * authority to act for * * * [named assured] may be implied, as in other agencies, by acts and conduct, but in order to bind * * * [the named assured] by * * * [the permittee's] acts his authorization must be express, implied or subsequently ratified by * * * [the named assured] * * *'; and in this process, the named assured can '* * * signify her permission to use the insured automobile by a course of conduct, or * * * mere silence to bring * * * [the sub-permittee] within the omnibus clause * * *' so long as '* * * such implied permission * * * [was] by act or conduct of * * * the named insured, and * * * amounted to her intended selection of him as such driver * * *.' "

Robison's statement, the use of the Ford by Grimm in furtherance of the original bailment and for the benefit of Robison who was still receiving the proceeds from the dairy as well as the use of this Ford to haul milk on the day following the accident after Robison had returned the Ford to Beatty's for repairs following the accident fully support the finding of the court.

The action of Mad River in permitting Robison to use their Ford truck to collect milk while his (Robison's) Dodge truck was being repaired included their implied permission to Robison to permit Grimm to use it in fulfillment of the original bailment. The trial court's findings included a finding that Robison and Grimm were engaged in a joint enterprise. This finding of fact is sustained by the evidence. Thus, the use of the Mad River truck by Grimm on September 6th in furtherance of the use granted by Mad River to Robison brings Grimm within the protection of Hoosier's policy. *Marolt* v. *Lisitz*, 94 Ohio App., 298; *West* v. *McNamara*, *supra*.

Applying the law to the facts found by the trial court, we conclude that Hoosier's second assignment of error is without merit.

Hoosier's third assignment of error is that "errors of law occurred during the trial to which the appellant took exception and which were prejudicial." Under this assignment of error Hoosier makes but one argument not previously assigned as error, that being that the trial court erred in permitting counsel for plaintiff to call John Grimm as on cross-examination. We have examined the record respecting the examination of John Grimm by counsel in this case and it is our opinion that the trial in this respect was fairly conducted and was not prejudicial to the rights of Hoosier Casualty Company. This assignment of error is without merit.

The judgment in favor of plaintiff against the defendant Hoosier Casualty Company is sustained by sufficient evidence and is not contrary to law. We have examined the entire record in considering the errors assigned and find no error prejudicial to the substantial rights of defendant Hoosier Casualty Company. The judgment of the trial court in favor of plaintiff against defendant Hoosier Casualty Company is affirmed.

The trial court rendered judgment in favor of defendant American Insurance Company. In the appeal of plaintiff, the following errors were assigned: (1) The judgment in favor of American Insurance Company is contrary to law. (2) The trial court erred in overruling plaintiff's motion for judgment notwithstanding the verdict or for a new trial against American Insurance Company. The appeal of defendant Buckeye Union assigns as error the giving of judgment in favor of American. Hoosier Casualty's fourth assignment of error is that the conclusion of law that the American Insurance Company should be dismissed is erroneous.

American Insurance Company had a garage liability policy with Beatty Motor Sales. The policy provided under Division I of Definitions of Hazards:

"The ownership, maintenance or use * * * of the premises for the purpose of an automobile dealer, repair shop * * * and all operations necessary or incidental thereto; and the * * * use of any automobile in connection with the above defined operations."

The policy also extended coverage under Division III:

"Definition of Insured * * * the unqualified word insured includes * * * (2) any person while using an automobile covered by this policy * * * provided the actual use is with permission of the named insured."

The trial court held that coverage did not extend to Grimm because Beatty delivered the Mad River truck to Grimm at the request of Mrs. Robison as an accommodation to Robison and Grimm so that the milk of Robison's customers could be delivered to the dairy in Dayton.

Plaintiff argues that the use of the Mad River truck at the time of the accident was required because it was necessary for Beatty to continue repairs to the transmission of the Robison Dodge, for which a charge was made by Beatty. Plaintiff argues further that Beatty would have been responsible to Robison for the loss of 8,000 pounds of milk on the truck at that time because of their inefficient repairs to the Dodge and the use on Robison's behalf of the Mad River truck to haul the milk being conveyed by the Dodge to Dayton while Beatty was correctly repairing the Dodge.

Defendant Hoosier Casualty argues that American is liable under its policy because its insured, Beatty, did not satisfactorily repair the Dodge transmission the first time it was brought in by Robison and that Beatty obtained the Mad River truck for Grimm, not at the request of Mrs. Robison, not as an accommodation to Robison and Grimm, but because it had improperly repaired Robison's Dodge and was trying to take care of a customer (Robison). Hoosier Casualty contends that the trial court's findings and conclusions on the issues between plaintiff and American are unrealistic and not supported by the evidence.

Defendant Buckeye Union argues that American is liable because its insured, Beatty, used the Mad River truck in connection with its operation of a repair shop in that it obtained the Mad River truck so that it could complete repairs to Robison's Dodge already begun.

Bearing upon the question of the liability of American, we find in the deposition of Russell Fahle, an employee of Beatty, this testimony:

"Mr. Beatty told me to take another boy with me, take the wrecker and go to West Liberty and pick up the Mad River truck and take it down to Woodstock and bring the Dodge back."

Fahle testified further that he went to West Liberty and asked Jim Hostetler, owner of a filling station where the Mad River truck was parked, "Who to get hold of, Glenn Robison wanted to use that milk truck out there." He testified further that Hostetler made a telephone call, and that, following the call, he (Fahle) and his co-worker took the Mad River truck to Woodstock and turned it over to Grimm, and that they towed the Dodge back to Beatty's. There is no evidence in the record to show that Beatty's men received any permission from Mad River to take their truck at this time.

In the trial court's judgment, which includes the findings of fact and conclusions of law, we find this language:

"Insofar as the defendant, American Insurance Company is concerned, and the insured, Beatty Motor Sales Company, the uncontradicted evidence is that Mrs. Robison directed the defendant, John Grimm, when he inquired of her the location of the Mad River Ford truck on the day of the accident to plaintiff, Arthur Webb, to call Beatty's garage and have them bring out the Mad River Ford truck and have Beatty's to pick up the Dodge truck at Woodstock, and accordingly it is the opinion, that the repairs to the Dodge had not been completed; that the repairs to the Dodge had been intermittently made to the transmission by Beatty Motor Sales Company from September 5 to the evening of September 7. Beatty Motor Sales were, at best, delivering the Mad River Ford milk truck as an accommodation to Robison and Grimm, so that the milk of Robison's customers could be delivered to the dairy in Dayton, and that the delivery of the Mad River Ford truck to Robison and Grimm was a substitute for Robison's Dodge. It is therefore the opinion of this court that the defendant, American Insurance Company, should be dismissed as a party defendant in this action * * *."

There is no evidence in the record to show that Beatty's knew when they obtained the Mad River truck on September 6th that Robison had permission from Mad River to use their truck or that they knew that Grimm had the implied permission of Robison to use it on that date. All that the evidence shows they knew was that Grimm told them that Mrs. Robison told him to have them get it for him. It is an uncontradicted fact that Beatty procured the Mad River Ford and permitted Grimm to use it.

American's policy insured, under Coverage A, bodily injury liability and defined its coverage under Insuring Agreements:

"Division I * * * The ownership, maintenance, or use of the premises for the purpose of * * * a repair shop * * * and all operations necessary or incidental thereto; and the * * * use of any automobile in connection with the above defined operations * * *."

And, Division III defines "Insured" as:

"* * * 'insured' includes * * * any person while using an automobile covered by this policy, and any person * * * legally responsible for the use thereof, provided the actual use * * * is by the named insured or with his permission."

American's policy covers the use of any automobile in connection with the operation of Beatty's repair shop and all operations necessary or incidental thereto, and provides that the word, "insured," includes any person while using an automobile covered by the policy and "any person * * * legally responsible for the use thereof, provided the actual use * * * is by the named insured or with his permission." The Mad River truck was "any automobile" and Grimm was "any person." American argues that Beatty's could not permit its use by Grimm. American's policy does not limit coverage to automobiles owned by Beatty's or to cars in their possession or control or used on the premises of Beatty. In the case of *Allstate Ins. Co.* v. *Urban*, 15 Ill. App. (2d), 386, a customer left her automobile with a repair shop for repairs while she was on a trip to Europe. The repair shop had a garage liability policy with Century Indemnity Company. The repair shop loaned this car to another customer, Stephen Urban, while his car was being repaired and he was involved in an accident. Allstate Insurance Company had issued a liability policy to Stephen Urban which provided, with respect to a substitute automobile, that its coverage should be excess insurance over any other collectible insurance. In its opinion holding that Stephen Urban was an "insured" under the policy of Century Indemnity Company, the court said, at page 395:

"One of the hazards against liability for which Century insured was the 'use of any automobile in connection with the above defined operations,' *i. e.*, in connection with 'the ownership, maintenance or use of the premises for the purpose of an auto-

mobile—repair shop—and all operations necessary or incidental thereto,' pursuant to the Definition of Hazards. The 'automobile' there referred to need not necessarily be one owned by the named insured, Highland Bump Shop. It may be, as here, a 1949 Mercury owned by someone else. It may be, literally, 'any automobile.' That is what the policy says.

"The 'use' there referred to need not necessarily be a frequent, regular, long continued, oft repeated use. The policy does not say so. It may be a use on one or more occasions, if it can properly be said to be otherwise a use (permissive, if by someone other than the named insured) in connection with the above defined operations. And if the use be of an automobile not owned by the named insured, Highland Bump Shop, it is of no concern in this present case whether, as between the shop and the owner of the automobile, the shop had or had not any right or authority so to use or permit its use by Stephen Urban, if there is in fact a permissive use thereof in connection with the above defined operations."

In that case, the repair shop had no authority to loan the car to Urban. In the case before this court Beatty had no authority from Mad River to obtain their Ford and turn it over to Grimm. The trial court rendered judgment in favor of American upon its conclusion that "the uncontradicted evidence is that Mrs. Robison directed the defendant, John Grimm, when he inquired of her the location of the Mad River Ford truck on the day of the accident to plaintiff, Arthur Webb, to call Beatty's Garage and have them bring out the Mad River Ford truck and have Beatty's to pick up the Dodge truck at Woodstock" and that "Beatty Motor Sales were, at best, delivering the Mad River Ford milk truck as an accommodation to Robison and Grimm, so that milk of Robison's customers could be delivered to the dairy in Dayton." Mad River had loaned its truck to Robison to use until his Dodge was repaired and he could permit Grimm to use it if the use was for his (Robison's) benefit. But Mrs. Robison had no right to exercise any control over the truck. It is significant that Grimm testified that he conveyed the message to Beatty's which he first claimed he received from Mrs. Robison, "Call Beatty Motors to bring the wrecker out, pull the Dodge in and bring the 1955 Ford out."

On cross-examination, Grimm testified that when the Dodge

broke down at Woodstock on September 6 he called Beatty's; that he did not know to whom he talked; that he called primarily in the hope that Robison would be there; that Robison was not there and he had a conversation with someone at Beatty's and that soon thereafter Beatty's men delivered the Mad River truck to him at Woodstock; that he told Beatty's during the telephone conversation that the truck was broken down and wouldn't run; that he told no one at Beatty's what kind of truck to get other than a milk truck or where to get it; and that he did not during the telephone conversation ask Beatty's to contact Mad River. Grimm testified that he did not know on September 6 where the Mad River truck was located. Grimm testified further on cross-examination that he didn't remember the exact conversation with Beatty's, but that when he hung up they were bringing a truck and a wrecker. Grimm testified further on cross-examination that he didn't remember exactly whether he told Beatty's to bring the Mad River truck to Woodstock; that he may have mentioned that truck to Beatty's.

The record shows this question propounded to Grimm on cross-examination: "Did they tell you they would bring that truck or a truck?" Grimm gave this answer, "Yes sir, they said they would bring a truck and the wrecker."

It is significant, too, that Fahle, an employee of Beatty's, testified that when he went to Hostetler's filling station at West Liberty to get the Mad River Ford he asked Jim Hostetler, "Who to get hold of, Glenn Robison wanted to use that milk truck out there." Under the evidence before the trial court on the issues between plaintiff and American, is the trial court's judgment supported by the evidence and in accordance with law? Before we pass upon this question we must consider another argument made by American.

American argues that its policy has as a part thereof a one page printed endorsement captioned "Use of other automobiles—broad form" which eliminates its liability under the policy in a case such as we have under consideration. We have examined this endorsement and conclude that it does not limit the coverage provided in Division I of the basic policy. It is an extension of coverage provided by the basic policy to the owner of the garage, his wife and daughter, to cover them while using any automobile not owned by the garage for which an ad-

ditional premium was charged. The exclusions in the endorsement have reference to the extension of coverage to those individuals.

The trial court's finding that "Beatty Motor Sales was, at best, delivering the Mad River Ford milk truck as an accommodation to Robison and Grimm, so that the milk of Robison's customers could be delivered to the dairy in Dayton" is supported by the evidence. But can it be concluded that in turning it over to Grimm, Beatty's extended coverage to Grimm under the terms of its garage liability policy? The facts in this case distinguish it from the case of *Allstate Ins. Co.* v. *Urban, supra.* In that case, the automobile had been put in the possession and control of the garage repair shop by its owner. The idea of substituting this car for the automobile being repaired originated in the mind of the management of the repair shop. In the case before us, Beatty's did not have custody and control of the Mad River truck when Grimm telephoned them and the idea of procuring this truck originated in the mind of Grimm and was conveyed by him to Beatty's. At the time Grimm telephoned Beatty's, Robison had permission of Mad River to use their Ford truck while his truck was undergoing repairs and Grimm had implied permission of Robison to use it in furtherance of this bailment. The trial court found these facts and we have said that such findings are sustained by the evidence. The trial court held that Beatty's act in procuring the Mad River truck and turning it over to Grimm was done as an accommodation to Grimm and Robison. The trial court did not find that Beatty's acted in furtherance of its garage repair business.

The findings and conclusions of the trial court on the issues between plaintiff and defendant American Insurance Company are sustained by the evidence and are not contrary to law. The judgment in favor of American Insurance Company is, therefore, affirmed.

*Judgment affirmed.*

CRAWFORD, P. J., and KERNS, J., concur.